# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
March 24, 2004 Session

## WANDA MOODY v. TIMOTHY HUTCHISON, SHERIFF OF KNOX COUNTY

**Appeal from the Chancery Court for Knox County**
**No. 153315-2     Daryl R. Fansler, Chancellor**

**FILED MAY 25, 2004**

**No. E2003-01325-COA-R3-CV**

Knox County Commissioner Wanda Moody ("Plaintiff") made a Public Records Act request for numerous documents in the possession of Timothy Hutchison, the Sheriff of Knox County ("Defendant"). Defendant responded and provided some, but not all of the requested documents. Plaintiff eventually sought to have Defendant held in criminal contempt claiming at least fifty of his responses to the various document requests were false. After a trial on the criminal contempt charges, the Trial Court concluded Defendant made "at least six" false representations which amounted to criminal contempt, and imposed the maximum fine of $50 for each offense, for a total of $300. Defendant appeals claiming, among other things, that the proof failed to establish that he was guilty beyond a reasonable doubt of criminal contempt. We affirm the judgment of the Trial Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., E.S., and BEN H. CANTRELL, SP. J., joined.

Mary Ann Stackhouse, Dean B. Farmer, and Keith L. Edmiston, Knoxville, Tennessee, for the Appellant Timothy Hutchison, Sheriff of Knox County.

Herbert S. Moncier, Knoxville, Tennessee, for the Appellee Wanda Moody.

## OPINION

## Background

The events giving rise to this litigation began when Plaintiff sought numerous public records from Defendant Tim Hutchison, the Sheriff of Knox County. By letter dated December 21, 2001, Plaintiff, by and through her attorney, sent Defendant a letter seeking production of certain documents pursuant to the Tennessee Public Records Act, Tenn. Code Ann. § 10-7-503. Plaintiff sought disclosure of, among other things:

> leases, rental or use agreements or any other written documents for the use of a barn located at 3633 Topside Road … and for the use of property located off Mascot Road and/or Mine Road along the Holston River where your helicopters are currently located and a project is currently underway ….

Plaintiff attached a rider to the request designating 26 specific groups or classes of documents which Plaintiff also sought to inspect and/or copy. In the rider, Plaintiff sought invoices, cancelled checks, receipts, etc., regarding the acquisition and upkeep of horses by the Knox County Sheriff's Department ("KCSD"). Plaintiff also sought invoices, cancelled checks, receipts, bid proposals, records of inmate labor or contract labor, etc., pertaining to the construction of horse stables off Maloneyville Road as well as the conversion of a temporary jail and training facility on Maloneyville Road to a dormitory. Plaintiff also sought original bank account statements, cancelled checks, deposit tickets, etc., for all bank accounts of any type maintained by KCSD. While the above is by no means exhaustive of the information requested by Plaintiff, suffice it to say that a significant number of documents were requested to be produced for inspection.

When responses to the Public Records Act request were not forthcoming, Plaintiff filed with the Trial Court on January 7, 2002, a Petition for Access to Public Records. In this petition, Plaintiff sought the documents referenced in the December 2001 letter and accompanying rider. The next day, in accordance with Tenn. Code Ann. § 10-7-505, the Trial Court entered an Order requiring Defendant to appear in court to show cause, if he had any, why the petition should not be granted. The Trial Court set the show cause hearing for January 14, 2002.

On January 11, 2002, Defendant filed a written response to Plaintiff's petition. In several of the specific responses, Defendant claimed KCSD did not maintain the requested records and referred Plaintiff to the Knox County Purchasing or Knox County Finance Departments. In several other responses, Defendant claimed there simply were no documents responsive to a particular request. For example, Defendant indicated there were no documents pertaining to the construction of horse stables on Maloneyville Road. While Defendant claimed there was no conversion of a temporary training facility into a dormitory, Defendant did admit that a temporary jail had been remodeled into a dormitory for trainees. Defendant denied conducting any project on Mascot Road and/or Mine Road. The documents produced by Defendant in the response comprised

-2-

a total of twenty-two (22) pages. The response was not signed by Defendant but instead was signed by attorney Carleton Bryant as Administrative Assistant to the Sheriff, and by Mary Ann Stackhouse, Deputy Law Director, who signed the pleading "As to Form" only. Plaintiff filed a reply claiming Defendant's response was altogether inadequate because Defendant was required to produce public records in his possession regardless of whether additional copies were maintained in other Knox County departments. Plaintiff also moved to strike the response claiming the signatures did not comply with Tenn. R. Civ. P. 11.02. Plaintiff's motion to strike was denied after the Trial Court permitted Defendant to amend his response at which time Deputy Law Director Stackhouse did not limit the scope of her signature.

On January 18, 2002, Defendant filed a Second Amended Response to Open Records Act Request ("Second Amended Response"). Defendant actually signed the Second Amended Response and it is this document which forms the basis for several issues on appeal. The Second Amended Response stated many of the documents Plaintiff requested were made available to her on January 14 and 17 of 2002. Defendant again denied a horse stable was being constructed off Maloneyville Road or that a temporary training facility had been converted to a dormitory, although "[t]here was a remodeling of the temporary jail to a dormitory for trainees." Defendant denied the existence of any project off Mascot Road or Mine Road in Knox County and, consequently, stated there were no documents responsive to the requests seeking information on such a project.

Plaintiff's Request No. 13 contained in the rider and Defendant's response in the Second Amended Response are as follows:

> 13. All original bank account statements, cancelled checks, deposit tickets, and checkbook stubs for banking accounts or (sic) any type maintained by the Knox County Sheriff's Department since January 1, 1996 ….
>
> RESPONSE: Petitioner's attorney was provided all of this information within the last eighteen months. Mr. Moncier [attorney for Plaintiff/Petitioner] sat in the Sheriff's office for two days with [Carleton] Bryant to inspect these records. Mr. Moncier brought his copier/scanner and copied the documents described. If petitioner wants to update the information from the last date of information received, defendant will make arrangements for petitioner to do so. To the extent maintained by the Sheriff's Department, to be made available January 17, 2002.

After setting forth separate responses to the twenty-six different document requests contained in the rider, Defendant ended his Second Amended Response with the following paragraph:

AS TO ALL REQUESTS:

Every effort has been made to supply petitioner through her counsel with the information requested. An extensive search through the files of the Sheriff's Department has been conducted, and the documents found to be responsive to petitioner's request have been provided. The remaining invoices from the Sheriff's Office have been made available to petitioner. Petitioner has been given the opportunity to search the files. If any further documents are found that respond to any of these Requests, petitioner will be notified and same will be made available promptly.

On January 24, 2002, Plaintiff filed a "Report on Defendant's Record Inspection" describing Defendant's record production which had taken place the previous week. According to Plaintiff, she, her attorney, and her attorney's staff were provided a space approximately 5 feet by 5 feet in which to inspect 15 banker's boxes filled with various records. Prior to the document inspection, Plaintiff and her attorney were informed that they would be video and audio-taped during the entire process. In this report, Plaintiff claimed many records still had not been produced and those that were produced were "in no particular order and were not organized by the topics used by Plaintiff to request records." According to Plaintiff, she and her attorney were unable to determine which request many of the documents pertained to and, making matters worse, Defendant intermixed numerous documents which Plaintiff never requested. Plaintiff claimed "[Defendant] deliberately included these voluminous irrelevant records to make Plaintiff's inspection as difficult as possible; to create the perception to the public that Plaintiff was making [an] unreasonable and expensive request; and to deter others from reviewing relevant records. This practice is often called a 'discovery dump' in civil litigation."

A hearing was held on January 28, 2002, and the Trial Court specifically noted that Defendant was not objecting to providing the requested documents. In response to Plaintiff's repeated protestations that all documents had not been provided, the Trial Court emphasized that it was granting the Public Records Act request and "[i]f they have not provided what you asked for, then you file your appropriate petition for contempt." The Trial Court strongly suggested to Defendant's attorney that she "explain to the sheriff that they either be produced or there will be a petition for contempt forthcoming."

On February 8, 2002, the Trial Court entered a Memorandum Opinion and Order which granted Plaintiff's Public Records Act request. In this order, the Trial Court discussed the pertinent history of the litigation, the various letters and communications between the parties, as well as the relevant provisions of the Public Records Act. The Trial Court also noted that a separate lawsuit was pending in the Knox County Chancery Court in which Plaintiff requested these very same documents from Defendant, but the Chancellor in that case had stayed all discovery. Notwithstanding the stay in the other lawsuit, Defendant had acknowledged in the present case that the documents sought by Plaintiff were public records pursuant to law and Plaintiff was entitled to

access to these records.[1]  The Trial Court also observed that the litigation process "has been quite acrimonious for counsel, if not the parties themselves … [and] counsels' deportment has fallen short of that expected of members of the bar practicing before this court."  According to the Trial Court:

> Common civility on the part of all counsel would, and should, have prevented the necessity for filing this action.  For the reasons set forth above, and for this reason, the award of attorney's fees will not be considered in this action.

> * * * *

> Counsel for petitioner has suggested that defendant has not provided access to all records requested.  As noted previously, defendant was ordered to produce the requested records for inspection pursuant to the Public Records Act.  Counsel for both parties are reminded of the procedures for enforcement of court orders and the remedies attendant thereto.

> Petitioner's request for access to public records of the defendant having been granted, this case is concluded.[2]

On February 19, 2002, Plaintiff filed a petition seeking entry of an order requiring Defendant to show cause why he was not in contempt of court for failing to provide all of the requested documents.  In this petition, Plaintiff also claimed many of Defendant's responses to the various document requests were false.  Plaintiff detailed the specific responses which she believed were false and which constituted contemptuous conduct.

On February 27, 2002, Plaintiff filed a motion pursuant to Tenn. Code Ann. § 21-1-108(2)(B)(ii)[3] for a hearing "and/or T.R.Crim.P. Rule 42(b) Show Cause Order".  In this motion Plaintiff stated, among other things, that:

> 3.      Upon filing of the Petition T.C.A. § 21-1-108(B)(ii) provides that the Court, if sufficient cause is shown, shall order the

---

[1] In light of Defendant's agreement that the records were subject to the Public Records Act and there was no objection to their production, the Trial Court held in a subsequent order that, at least as of January 14, 2002, any stays in the other lawsuit could not be used as a defense to production of the documents in the present case.  This particular conclusion by the Trial Court is not at issue in the present appeal.

[2] Volume I of the Technical Record ends with page 119 and the Trial Court's dismissal of this lawsuit after ordering production of the requested documents.  The "acrimonious" behavior quite obviously continued, as evidenced by the fact that the Technical Record on appeal comprises nine (9) volumes totaling 1,236 pages, not counting two banker's boxes filled with transcribed testimony and exhibits.

[3] Tenn. Code Ann. § 21-1-108 was repealed effective July 1, 2002.

issuance of an attachment of the body of the contemnor, fixing the time and place of the appearance to answer, and also the amount and character of the bail bond to be taken.

4. T.R.Crim.P. 42(b) provides for the Court to issue an order to a defendant to show cause or an order of arrest on a notice of contempt.

* * * *

Plaintiff moves that the Court enter a Show Cause Order to Defendant for March 15, 2002 at 9:00 a.m. for Defendant to appear and show cause why he is not in contempt of court.

The parties continued to file numerous motions and various other pleadings. The stay in the other Chancery Court lawsuit eventually was lifted and discovery in that case continued as well. While discovery in the other lawsuit was proceeding, numerous documents were produced by Defendant which Plaintiff claims should have been produced months earlier in response to the Public Records Act request in the present case. Plaintiff also claimed deposition testimony in the other case further proved that Defendant made false responses to Plaintiff's document requests herein. Accordingly, Plaintiff sought to have this newly discovered evidence admitted in the contempt proceeding.

The hearing on the criminal contempt charges began in October of 2002. We will not discuss all of the testimony of the witnesses which took place over several days, but we will summarize the testimony of a few key witnesses. The first witness at trial was Scott Walker ("Walker"), who testified to a landing fee agreement he entered into with KCSD. Walker also testified to a "side agreement" with KCSD wherein Walker agreed to provide construction services. Walker identified a memorandum from the Sheriff's Department intended "to hold me to my agreement to provide the improvements. And it also spells out the improvements that the sheriff's department was supposed to provide." Walker testified he was told that the improvements could not be part of the landing fee agreement "as it would become a lease. And if it had to be a lease, it had to go before county commission, and they didn't want to do that." Walker also incurred attorney fees in having the lease changed to the landing fee agreement so the county commission did not become involved. Walker's attorney sent his bill to the Sheriff's Department after KCSD agreed to pay those fees. Walker testified Captain Spangler was overseeing all improvements in the project off Mine Road and Mascot Road. Originally, the monthly rent for the landing fee was to be in the neighborhood of $600 to $700. However, Sheriff Hutchison wanted Walker to build an aircraft hangar and offices for the aviation unit, but these improvements could not be part of the agreement. According to Walker, Defendant Hutchison asked Walker if he would build these additions in exchange for higher monthly rent. Walker agreed. The rent eventually agreed to by Defendant and Walker was $2,700 per month. Walker identified many documents associated with the improvements. At the time the allegedly contemptuous statements were made by Defendant, the vast

majority of the documents pertaining to the projects off Mine Road or Mascot Road had not been produced.

The next witness was Tracy Haynes ("Haynes"), manager of the new service department for Knoxville Utility Board ("KUB"). Haynes is the custodian of records and through his testimony, several documents were admitted which showed work performed by KUB off Mine Road and/or Mascot Road for the Sheriff's Department. One of these documents was sent to KCSD. After Haynes' testimony, the Court inquired of defense counsel if it was still her client's position that there was no project off Mine Road. Defendant's position remained the same.

Carol Holbert ("Holbert") is the custodian of records in the law office of Plaintiff's attorney. Holbert maintained, organized, etc., the records produced by Defendant. As Holbert was organizing the records produced on January 17, 2002, she discovered many missing documents. Some but not all of those documents were found. Holbert also discovered the responses to the document request did not contain any information from three bank accounts. Holbert learned of the existence of these three accounts by ascertaining where some of the checks which had been produced were deposited. Holbert testified that additional banking records were not provided until depositions were taken in April of 2002. With regard to a couple of the checking accounts that were not produced when the Second Amended Response was filed, Holbert testified that these account were opened in the names of KCSD employees using their personal social security numbers.

Anthony Parker ("Parker") testified that he worked for KCSD from August of 1994 until September of 2002. Parker's testimony continued in more detail. Parker worked on the construction crew during 2001 and 2002. Parker began constructing horse stables on Maloneyville Road for KCSD in 2001. Parker was instructed by Chief Merritt to "build a horse stable and to build it post hastily." Parker and other officers obtained the building materials. Parker would obtain from the personnel department a purchase order or a payable warrant, depending on how much money was needed. "And we would go to those places and give them the numbers, sign the ticket, and get what we need.… Most of the time we would not tell [people in the sheriff's department downtown] … what we were building because we were told not to." Parker testified he knew KCSD did not have permission to build the horse stables. Parker testified he had discussions with his superiors that the horse stables were not approved by the county commission. Records for the purchases were kept in a four inch folder which was "full of … copies of all the invoices" and the originals were sent downtown. A couple of months after the horse stables were completed, Parker went back and remodeled the stables to hold three more horses. Inmates also were used to help construct the horse stables. Records of inmate labor were maintained at the old penal farm. Inmates generally worked with the construction crew on other projects as well. Parker also testified that an airport or helipad was being built for KCSD off Mine or Mascot Road. The construction crew also assisted with the Mine Road/Mascot Road project. Plaintiff's counsel stopped by the construction project several times. When this happened, Parker was ordered to "put the inmates up [and] sit in the office until we tell you otherwise." They also would stop the construction.

On February 12, 2003, the Trial Court issued an extensive Memorandum Opinion and Order and began by summarizing the procedural history of this case. The Trial Court took particular notice of the following, which we paraphrase:

1. When Defendant filed his initial response to the Public Records Act request on January 11, 2002, he purported to address all twenty-six groups of documents requested in the rider. Defendant claimed that the twenty-two pages of documents attached to the response were all of the documents in his possession which were responsive to the requests. Defendant indicated that certain documents previously had been supplied to Plaintiff and, for many of the requests, either no such records existed or they were in the possession of other Knox County departments.

2. The parties appeared at the initial show cause hearing on January 14, 2002. At that time, "[c]ounsel for defendant made several representations regarding the completeness of defendant's responses. It was represented that while the Sheriff's Department might have copies of some of the records the Department did not maintain originals. At any rate, counsel acknowledged that defendant would respond to plaintiff's request for access…."

3. On January 17, 2002, Defendant made numerous records available, producing fifteen banker's boxes of documents. On January 18, 2002, Defendant filed the Second Amended Response, which was signed by Defendant who continued to maintain there were no horse stables being constructed, yet alleged that records pertinent to the mounted patrol had been produced on January 17. A similar assertion was made to the requested documents regarding conversion of a temporary training facility to a dormitory. Defendant continued to deny any project taking place off Mascot Road and/or Mine Road. "In some instances though, defendant agreed to make available records … in response to plaintiff's request regarding the alleged project …. In other instances, defendant denied that any documents existed."

The Trial Court then reviewed Plaintiff's petition for contempt and the sixteen specific areas where Plaintiff claimed Defendant's responses were false.[4] The Trial Court discussed some of the various deposition testimony which Plaintiff claimed revealed the existence of numerous

---

[4] Plaintiff's challenge to Defendant's veracity was not limited to the Second Amended Response. All in all, in the sixteen areas where Plaintiff claimed documents were not produced, she identified over fifty statements she claimed were false.

documents which had not been produced, notwithstanding Defendant's assertions to the contrary. The Trial Court also determined that while Plaintiff's petition for contempt did not specify whether she was seeking to have Defendant held in civil or criminal contempt, it nevertheless was clear from the pleadings and the proof that Plaintiff was pursuing criminal contempt charges.[5] The Trial Court then discussed the law applicable to criminal contempt proceedings, noting that conduct punishable as contempt was set forth in Tenn. Code Ann. § 29-9-102, and guilt for criminal contempt must be established by proof beyond a reasonable doubt.

Next, the Trial Court reviewed Defendant's initial response to the document request in light of the proof established at the hearing, concluding the responses to 23 of the 26 requests were either "totally or partially false." For example, Defendant claimed his department did not keep originals of many documents, but the proof "throughout the course of this case has established beyond a reasonable doubt that this statement was false." In addition, a structure was being built which could be "described as nothing but a horse stable." The Trial Court discussed many other statements in the initial response and the proof which established those statements were false. For the sake of brevity, we will not discuss each of them here.

Once the Trial Court determined which of the responses by Defendant were false, the Trial Court focused on whether criminal contempt had been established. Relying on *Maples v. State*, 565 S.W.2d 202 (Tenn. 1978), the Trial Court emphasized that false statements alone were insufficient to support a finding of criminal contempt. There also must be "an additional element of obstruction of justice or interference with the processes of the court." Because many documents were produced eleven days after the false statements in the initial response were made, the Trial Court concluded there had been no obstruction of the administration of justice or unlawful interference with the proceedings of the court. In other words, even though there were numerous patently false statements in the January 11 response, these false statements did not amount to criminal contempt.

The Trial Court then shifted its focus to Defendant's Second Amended Response, a document which, "for the first time, bore the signature of Sheriff Hutchison" and which indicated that certain documents whose existence previously had been denied were produced on January 17, 2002. The proof at trial, however, was that numerous bank accounts and public records pertaining to those accounts were produced well after that date. During the deposition of Captain Spangler in April of 2002, he testified about a checkbook for an account with the Knoxville Police Department Credit Union. Captain Spangler testified that a few days after his deposition he gave the checkbook to someone with KCSD, but could not recall who that person was. Captain Spangler had no explanation as to why the checkbook had not been produced prior to August of 2002. Mitzi Taylor testified she is the administrative assistant to Chief Ruble who also serves as legal counsel for Defendant. Ms. Taylor was responsible for maintaining the checkbook for KCSD's state and federal

---

[5] At this point in the litigation it appeared that all of the requested documents finally had been produced. As such, Plaintiff acknowledged that if Defendant had been in civil contempt, he purged himself of that contempt by complying with the Trial Court's original order.

accounts. Ms. Taylor acknowledged receiving letters requesting various documents and, while she claimed to have done her best in locating these documents, as of November 4, 2002, seven banker's boxes had not been produced. Likewise, testimony from construction division workers established that there were records of inmate labor on the particular jobs referenced by Plaintiff despite Defendant's denial of the existence of such records in paragraphs 17 and 18 of the Second Amended Response.

After reviewing the pertinent testimony, the Trial Court concluded Defendant did not produce some of the requested documents until many months after the date he claimed they were produced. Because of these false statements, Plaintiff was required to take depositions in order to discover the existence of the non-produced public records. The Trial Court then stated:

> There is no way to escape the conclusion that there were willfully false statements made in the January 18, 2002 pleading signed by Sheriff Hutchison and that the effect of these willfully false statements was to obstruct and interfere with the processes of the Court. Regrettably, the Court thus finds that the making of these false statements constitutes a contempt pursuant to Tenn. Code Ann. § 29-9-102(1) and (4).
>
> * * * *
>
> In the January 18, 2002 pleading, the only one signed by the Sheriff, the Court determines that false statements were made in reference to the bank accounts (Paragraph 13) and under the caption "As To All Requests", each and every statement thereafter contained false representations. Thus, the Court determines that there [are] at least six (6) false representations in the January 18, 2002 pleading alone and accordingly sets the maximum fine allowable by statute at $300.00.[6] The Court reiterates that the Petition for Contempt has not charged defendant with willfully failing to obey an order of the court and therefore penalties for successive contempts for failing to obey the Court's order from January 18, 2002 until November 4, 2002 are not available.

After the Trial Court issued its ruling, the parties continued their standard practice and filed numerous post-trial motions. The only post-trial motion at issue on this appeal is a motion by Plaintiff seeking to have Defendant held personally responsible for paying any fines, attorney fees, and court costs. This motion was denied by the Trial Court.

---

[6] The Trial Court noted that in addition to a maximum fine of $50, imprisonment of up to ten days for each offense was also authorized by statute. The Trial Court declined to imprison the Sheriff after concluding that sending him to jail would be a disservice to the citizens of Knox County.

Defendant appeals raising three issues. First, Defendant claims there was insufficient proof that he was guilty of criminal contempt beyond a reasonable doubt. Second, Defendant claims that Plaintiff's proper remedy was civil contempt, not criminal contempt. Third, Defendant claims there was insufficient notice for him to be found guilty of criminal contempt in his individual capacity. Plaintiff raises two issues, the first being whether there is a final appealable judgment. Plaintiff's second issue is her claim that the Trial Court erred when it denied her motion to have Defendant held personally responsible for any fines, attorney fees, and court costs.

## Discussion

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

The first issue we will address is Defendant's claim that Plaintiff failed to prove he was guilty of criminal contempt beyond a reasonable doubt. As this Court recently observed in *Barber v. Chapman*, No. M2003-00378-COA-R3-CV, 2004 Tenn. App. LEXIS 111 (Tenn. Ct. App. Feb. 23, 2004), *no appl. perm appeal filed*:

> In a criminal contempt case, the guilt of the accused must be established beyond a reasonable doubt. *Black v. Blount*, 938 S.W.2d 394 at 398 (Tenn. 1996) (citing *Robinson v. Air Draulics Engineering Co.*, 214 Tenn. 30, 377 S.W.2d 908, 912 (Tenn. 1964). However, on appeal, individuals convicted of criminal contempt lose their presumption of innocence and must overcome the presumption of guilt. "Appellate courts do not review the evidence in a light favorable to the accused and will reverse criminal contempt convictions only when the evidence is insufficient to support the trier-of-fact's finding of contempt beyond a reasonable doubt." *Thigpen v. Thigpen*, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993) (citing Tenn. R. App. P. 13(e)). Furthermore, appellate courts review a trial court's decision of whether to impose contempt sanctions using the more relaxed abuse of discretion standard of review. *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993).

*Barber*, 2004 Tenn. App. LEXIS 111, at *8. *Accord*, *Freeman v. Freeman*, No. M2002-02558-COA-R3-CV, 2003 Tenn. App. LEXIS 660, at * 22 (Tenn. Ct. App. Sept. 16, 2003), *appl. perm. appeal denied March 22, 2004* ("Appellate Courts review a trial court's decision to impose contempt sanctions using the more relaxed 'abuse of discretion' standard or review.… The court of appeals

has 'appellate jurisdiction over civil or criminal contempt arising out of a civil matter.' *See* T.C.A. § 16-4-108(b)…").

It is clear that the Trial Court painstakingly reviewed the significant evidence which had been presented at the contempt proceedings. It is true Defendant and KCSD employees testified that Defendant never instructed anyone not to produce any documents and that they tried to gather the requested documents. Focusing on this testimony, and asking this Court to disregard everything that does not pertain to the six responses for which Defendant was held in criminal contempt, Defendant asserts the proof altogether fails to prove criminal contempt beyond a reasonable doubt.

In reaching its conclusions, the Trial Court had the opportunity to assess the demeanor and credibility of all the witnesses who testified at trial. The Trial Court undoubtedly was presented with conflicting proof. On the one hand, Defendant and his employees painted a picture of cooperation and significant attempts to provide the voluminous requested documents as quickly as possible and attributed documents which were not produced to mere oversights or inadvertent mistakes. On the other hand, Plaintiff painted a picture of extreme obstructive behavior by Defendant and one intentional roadblock after another either preventing or delaying production of the documents notwithstanding Defendant's representations to the contrary. "Unlike this Court, the trial court observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). A trial court's determinations regarding credibility are accorded deference by this Court. *Id.; Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001).

We decline to view Defendant's six statements which were held to be criminally contemptuous in total isolation from the bigger picture. The Trial Court certainly was entitled to rely on Defendant's conduct throughout the proceedings and any legitimate inferences to be drawn therefrom. In resolving this issue, we cannot ignore the inferences to be drawn from all of the proof. By way of example only, the Trial Court found that 23 of the 26 responses in the first response were either "totally or partially false" even though these particular false statements did not rise to the level of criminal contempt. This type of conduct by Defendant, albeit criminally non-contemptuous, nevertheless gives rise to legitimate inferences which could impact the ultimate finding.

Defendant comes to this Court without the presumption of innocence, and we do not review the evidence in a light favorable to him. This Court's function on this issue is to determine whether there was sufficient evidence to support the Trial Court's six separate findings of criminal contempt beyond a reasonable doubt. Based upon our review of the entire record before us as already discussed in this Opinion, we conclude that there was sufficient evidence to support the Trial Court's findings of criminal contempt.

The next issue is Defendant's argument that the judgment of the Trial Court must be reversed because he did not receive proper notice of the criminal contempt charges as required by Tenn. R. Crim. P. 42(b). Tenn. R. Crim. P. 42 provides as follows:

-12-

**Rule 42. Criminal Contempt. –** (a) Summary Disposition. – A criminal contempt may be punished summarily if the judge certifies that he or she saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

(b) Disposition upon Notice and Hearing. – A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the district attorney general or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest.[7] The defendant is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the hearing except with the defendant's consent. Upon a verdict of finding of guilt the court shall enter an order fixing the punishment.

Plaintiff argues Defendant received ample notice and, even if he did not, this defense should be deemed waived in accordance with Tenn. R. Crim. P. 12 because it was not raised prior to trial. Tenn. R. Crim. P. 12(b) and (f) provide, *inter alia*, that defenses and objections based on "defects in the institution of the prosecution" are waived if not raised prior to trial, although the "court for cause shown may grant relief from the waiver."

A charge of criminal contempt is somewhat peculiar because such a charge encompasses aspects of both criminal law and civil law. In a criminal contempt case, many of the constitutional protections afforded a criminal defendant must be observed. For example, as discussed above, guilt must be proven beyond a reasonable doubt. *See Shiflet v. State*, 217 Tenn. 690, 400 S.W.2d 542 (Tenn. 1966). In *State v. Wood*, 91 S.W.3d 769 (Tenn. Ct. App. 2002), this Court noted that criminal contempt was "enough of a crime" for the double jeopardy provisions in the federal and state constitutions to apply. *Id.* at 773 (citing *Ahern v. Ahern*, 15 S.W.3d 73 (Tenn. 2000)). On the other hand, criminal contempt is "not enough of a crime" to require initiation by an indictment or presentment, and there is no right to a trial by jury. *State v. Wood*, 91 S.W.3d at 773. Case law is clear, however, that criminal contempt is "enough of a crime" to require proper notice.

---

[7] Our Supreme Court has held that in addition to the prosecutors named in Rule 42(b), a criminal contempt charge arising out of a civil matter can be prosecuted by an attorney representing the other party. *See Wilson v. Wilson*, 984 S.W.2d 898 (Tenn. 1998).

In *Gompers v. Bucks's Stove & Range Co.*, 221 U.S. 418 (1911) the United States Supreme Court stated that:

> manifestly every citizen, however unlearned in the law, by mere inspection of the papers in contempt proceedings ought to be able to see whether it was instituted for private litigation or for public prosecution, whether it sought to benefit the complainant or vindicate the court's authority. He should not be left in doubt as to whether relief or punishment was the object in view. He is not only entitled to be informed of the nature of the charge against him, but to know that it is a charge and not a suit.

*Gompers*, 221 U.S. at 446. *See also Storey v. Storey*, 835 S.W.2d 593, 599-600 (Tenn. Ct. App. 1992).

When Plaintiff filed the petition for contempt, she did not specify whether she was seeking to have Defendant held in civil or criminal contempt. At the hearing on June 21, 2002, the Trial Court inquired about Plaintiff's intentions along this line and defense counsel stated "[c]riminal contempt, Your Honor, and civil contempt both. We do make a prayer for relief for punishment as well as civil, yes, sir."[8] The Court and counsel then began discussing the rules applicable to criminal contempt proceedings and the following dialogue took place:

> THE COURT: [We] have to … advise the defendant of what he is charged with. And the defendant in the case is represented by the county law department and I presume is aware, but maybe he's not. Maybe I need to advise the sheriff of what he's being confronted with in terms of the request for criminal sanctions.
>
> MR. MONCIER: We did that, Your Honor. Now, we did that by – we complied with [42(b)] in terms of –
>
> THE COURT: Setting forth –
>
> MR. MONCIER: Yes, sir. it's set out – the reason I used the specification format, there [are] 17 specifications of false statements, the basis of those false statements, and the factual predicate for the false statements as required by Rule 42 ….

---

[8] In *Cooner v. Cooner*, No. 01-A-01-9701-CV-00021, 1997 Tenn. App. LEXIS 690 (Tenn. Ct. App. Oct. 10, 1997), *no appl. perm appeal filed*, this Court observed that civil and criminal contempt proceedings should not be tried together because of the significant differences in the respective procedural rights and burdens of proof. We added that giving Tenn. R. Crim. P. 42 notice as soon as possible eliminates any possible confusion regarding the nature of the proceedings, thereby enabling the alleged contemnor to invoke his procedural rights. *Cooner*, 1997 Tenn. App. LEXIS 690, at * 16.

THE COURT: Ms. Stackhouse … I take it that you're here to represent the sheriff understands the nature of the charges being made against him in these proceedings.

MS. STACKHOUSE: He does, Your Honor.…

Plaintiff's counsel further pointed out that in the first 14 specifications, Plaintiff claimed Defendant made false statements to the court which had the effect of impeding "the progress of the Public Records Act and the production of public records and this court's processes."

The trial on the criminal contempt charges began almost four months after the above discussion took place. During closing arguments Defendant's counsel argued, among other things, that Plaintiff had not met her burden "on the subject of criminal contempt, the plaintiff has not met her burden of guilty beyond a reasonable doubt." It is apparent that defense counsel prepared for and tried a criminal contempt case, and in fact successfully defended her client against most of the charges. When the Trial Court issued its judgment, it specifically pointed out that to the extent Defendant had been in civil contempt, he purged himself of that contempt when he finally produced all of the requested documents. Therefore, the Trial Court appropriately focused only on whether Defendant was proven guilty of criminal contempt beyond a reasonable doubt.

As best we understand Defendant's argument, he claims that since the request for public records was made to him in his official capacity as Sheriff, then any criminally contemptuous conduct on his part must necessarily have been done in that official capacity, as opposed to an individual capacity. Therefore, he assumed the criminal contempt proceedings were being brought against him only in his official capacity. Taking that one step further, Defendant insists that he was entitled to a separate Tenn. R. Crim. P. 42(b) notice informing him that Plaintiff was seeking to have him held in criminal contempt in his individual capacity. We disagree. Clearly Defendant knew that he was the individual who signed the Second Amended Response. Equally as clear is the fact that at least part of the basis for the alleged criminal contempt was the allegedly false statements made in the Second Amended Response signed by Defendant. Therefore, Defendant clearly had notice that the basis for the claimed criminal contempt was his allegedly false statements. Defendant was held in criminal contempt because the Trial Court concluded *he* made false statements which had the effect of obstructing the proceedings of the court. If Defendant had made the exact same false statements with the same obstructive effect in litigation which did not involve his department, his statements would be no less contemptuous. In other words, it is entirely immaterial that the document containing the false statements happened to be a response to a Public Records Act request. Defense counsel specifically represented to the Trial Court that her client understood the nature of the charges placed against him. It is hard to imagine what else the Trial Court could have done after this concession to further assure Defendant had proper notice of the charges. We conclude Defendant was provided with ample notice as required by Tenn. R. Crim. P. 42. In light of this conclusion, we pretermit the issue of whether Defendant waived this defense.

Defendant's next issue is his claim that the proper remedy for Plaintiff to pursue was civil contempt, not criminal contempt. The difference between civil and criminal contempt was recently discussed by our Supreme Court in *Doe v. Bd. of Professional Responsibility*, 104 S.W.3d 465 (Tenn. 2003) as follows:

> We have on numerous occasions stated that a contempt may either be civil or criminal in nature. *See Wilson v. Wilson*, 984 S.W.2d 898, 906 (Tenn. 1998) (Birch, J., dissenting); *Black*, 938 S.W.2d at 398-401; *Turner*, 914 S.W.2d at 954. Civil contempt occurs when a person does not comply with a court order and an action is brought by a private party to enforce rights under the order that has been violated. *See Black*, 938 S.W.2d at 398; *Robinson v. Air Draulics Eng'g Co.*, 214 Tenn. 30, 377 S.W.2d 908, 912 (1964); *Turner*, 914 S.W.2d at 995. Punishment for civil contempt is designed to coerce compliance with the court's order and is imposed at the insistence and for the benefit of the private party who has suffered a violation of rights. *See Black*, 938 S.W.2d at 398; *Turner* 914 S.W.2d at 955; *Sherrod v. Wix*, 849 S.W.2d 780, 786 n.4 (Tenn. Ct. App. 1992). Also, in civil contempt cases, the quantum of proof necessary to convict is a preponderance of the evidence. On the other hand, criminal contempts are "intended to preserve the power and vindicate the dignity and authority of the law, and the court as an organ of society." *Black*, 938 S.W.2d at 398. Punishment for criminal contempt is both punitive and unconditional in nature and serves to adjudicate "an issue between the public and the accused." *Id*. In criminal contempt proceedings, the defendant is presumed to be innocent and must be proven guilty beyond a reasonable doubt. *See Shiflet v. State*, 217 Tenn. 690, 400 S.W.2d 542, 543 (1966).

*Doe*, 104 S.W.3d at 473-74.

There is no doubt that Plaintiff wanted access to the documents which Defendant agreed, but failed, to provide. If Defendant had provided what he affirmatively represented that he had provided, then this case would have ended long ago when the Trial Court initially dismissed the case after it granted Plaintiff's petition. *See* footnote 2, *supra*. Nevertheless, we do not see how Plaintiff's desire for the requested documents means criminal contempt charges were not properly pursued. Civil and criminal contempt have separate goals, elements, and burdens of proof. Since all the elements and the burden of proof necessary to establish criminal contempt have been met in this case, we see no legitimate reason for this Court to invalidate both Plaintiff's choice to pursue criminal contempt and the Trial Court's finding of criminal contempt by holding that civil contempt was the only appropriate remedy because production of documents is all Plaintiff "really" wanted. If that were the case, then Plaintiff would not have pursued criminal contempt charges once she acknowledged all of the requested documents finally had been produced prior to the contempt trial.

The Trial Court's finding of guilt beyond a reasonable doubt will, hopefully, "preserve the power and vindicate the dignity and authority of the law, and the court as an organ of society." *Black*, 938 S.W.2d at 398. We affirm the judgment of the Trial Court on this issue.

The first issue raised by Plaintiff is her claim that there is no final appealable judgment as of yet because the Trial Court has not ruled on her motion seeking attorney fees incurred to prosecute the criminal contempt action. Our Supreme Court has held that attorney fees can be awarded to compensate a private attorney appointed by a trial court to prosecute criminal contempt actions. *See Black v. Blount*, 938 S.W.2d 394 (Tenn. 1996). The *Black* Court determined that attorney fees were available under the authority of *Ferguson v. Paycheck*, 672 S.W.2d 746 (Tenn. 1984), which adopted the following rule setting forth when a trial court can appoint and order compensation of counsel:

> [T]here must exist a necessity for the services of a member of the bar to serve the court in reaching a proper resolution of questions or issues presented and pending before the court, in which case the court may award compensation to be paid by the party or parties responsible for the situation that prompted the court to make the appointment. The rule excludes the appointment of counsel to serve the interests of litigants, witnesses, or any other private parties.

*Ferguson*, 672 S.W.2d at 747-48; *Black*, 938 S.W.2d at 403. In *Black*, our Supreme Court further stated that because attorney fees for prosecuting a criminal contempt action were available under *Ferguson*, it did not have to decide whether they were also available as costs under Tenn. Code Ann. § 29-9-103, which is the statutory provision fixing punishment for criminal contempt. *See Black*, 938 S.W.2d at 403 n.5. We also decline to decide whether attorney fees are available under Tenn. Code Ann. § 29-9-103 as costs or an additional form of punishment since they are otherwise available in accordance with *Black* and *Ferguson*. In *State v. Green*, 689 S.W.2d 189 (Tenn. Crim. App. 1984), the Court of Criminal Appeals stated that "a judgment of contempt, summary or otherwise becomes final upon the entering of punishment therefor, 17 C.J.S. *Contempt* § 114 (1963), and is thus appealable as of right under Rule 3 T.R.A.P. It matters not that the proceedings out of which the contempt arose are not complete." *Green*, 689 S.W.2d at 190. Based on *Green*, we conclude there is a final appealable judgment for purposes of the criminal contempt charges.[9]

Plaintiff's final issue is her claim that the Trial Court erred when it denied her motion seeking to have Defendant held personally responsible for: (1) fines, attorney fees, costs, etc., associated with the contempt proceedings; and (2) attorney fees, costs, etc., pursuant to the Public Records Act. As set forth above, attorney fees for the criminal contempt action can be awarded

---

[9] The Trial Court severed the criminal contempt charges which pertained to Defendant's responses regarding a project taking place on Topside Road. Neither party appeals the decision of the Trial Court to sever the contempt issues on that project. If Defendant is found in criminal contempt as it pertains to that project, then there will be a separate final appealable judgment once the punishment is entered. The severing of the issues pertaining to that project does not affect the finality of the judgment at issue on this appeal.

pursuant to *Black* and *Ferguson*.  Attorney fees can also be awarded against the nondisclosing governmental entity pursuant to the Public Records Act, which provides as follows:

> If the court finds that the governmental entity, or agent thereof, refusing to disclose a record, knew that such record was public and willfully refused to disclose it, such court may, in its discretion, assess all reasonable costs involved in obtaining the record, including reasonable attorneys' fees, against the nondisclosing governmental entity.

Tenn. Code Ann. § 10-7-505(g).

According to Plaintiff, the Knox County Law Director has indicated that Knox County would pay the $300 fine imposed by the Trial Court.  Plaintiff challenges this potential action and further seeks to prohibit Knox County citizens from having to pay any other costs, attorney fees, etc., which may be imposed.  Plaintiff claims Knox County does not have the authority to appropriate money to pay Defendant's fine or any of the other potential costs or attorney fees.  Plaintiff argues state law, the Knox County Code, as well as public policy would prohibit Knox County and, in effect, the citizens, from paying these expenses.

We have affirmed the imposition of the $300 fine against Defendant in his individual capacity.  We believe Defendant is personally responsible for payment of this fine and so hold.  The question then becomes whether or not Knox County has authority to reimburse Defendant out of taxpayer dollars for the $300 fine.  Based on Plaintiff's brief, it does not appear that Knox County actually has reimbursed Defendant for the $300 or that it definitively has decided to do so.  Unless and until that happens, we do not believe this issue is ripe for review.  With regard to the request for attorney fees, costs, etc., again and for the same reasons, we do not believe these various issues are ripe for review at this point in the litigation.  When and if attorney fees and other costs are assessed against Defendant, and when and if any or all of these expenses are paid by Knox County or Knox County definitively agrees to pay them, those issues then will be ripe for review.

## Conclusion

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for further proceedings consistent with this Opinion and for collection of the costs below. Exercising our discretion, costs on appeal are assessed one-half against the Appellant Tim Hutchison and his surety, and one-half against the Appellee Wanda Moody.

_____

D. MICHAEL SWINEY, JUDGE

-18-