# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 25, 2011

## STATE OF TENNESSEE v. THOMAS W. MEADOWS

**Appeal from the Criminal Court for Sullivan County**
**No. S57,691    Robert H. Montgomery, Jr., Judge**

---

**No. E2011-00708-CCA-R3-CD - Filed February 16, 2012**

---

The Defendant, Thomas W. Meadows, appeals as of right from his conviction for one count of indirect criminal contempt. The Defendant contends that the evidence was insufficient to sustain his conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Michael J. LaGuardia, Kingsport, Tennessee (on appeal); and Thomas W. Meadows, pro se (at trial), for the appellant, Thomas W. Meadows.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; H. Greeley Wells, Jr., District Attorney General; and Kaylin Render, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant was indicted for two counts of domestic assault, one count of possession of drug paraphernalia, and one count of resisting arrest as a result of an incident that occurred on December 26, 2009. As a condition of his bail, the Defendant was ordered to have no contact with the alleged victims, his wife and daughter. The order was entered on December 27, 2009. On November 29, 2010, following a jury trial, the Defendant was acquitted of the domestic assault and resisting arrest charges.[1] Shortly after the Defendant's acquittal, the State filed a "motion for contempt/show cause [sic]" alleging that the

---

[1]The possession of drug paraphernalia charge was dismissed.

Defendant violated the no contact order while the domestic assault case was pending. The trial court held a hearing on this matter on December 8, 2010, and February 2, 2011.

The State subpoenaed the Defendant's counsel to testify at the show cause hearing. The Defendant chose to represent himself at the hearing and signed a waiver to that effect. At the hearing, the State played an audio recording of an October 13, 2010 pretrial hearing at which counsel stated that the Defendant lived with his wife. Counsel testified that he made the statement in error and that he "should have said" the Defendant's wife lived with her parents. Counsel elaborated that he "just started talking and it just came out." Counsel testified that he did not "know what got that to come out, but it was not due to [his] client telling [him] that . . . [the Defendant] and any of the victims were still living together." Counsel blamed his confusion on the fact that he had been retained by the Defendant the night before the pretrial hearing. Counsel testified that the Defendant had been sworn in prior to the hearing, and that the Defendant "never corrected [counsel] or told [him] that [he] [was] making misrepresentations to the [c]ourt."

Counsel denied that at a November 19, 2010 pretrial hearing, he passed a note to an Assistant District Attorney stating that the Defendant was "living with the victim and that the State should be able to easily subpoena her because that's where she's living." Instead, counsel insisted that "the actual wording of the note . . . was 'That's where she is.'" Counsel explained that they "were at the time speaking about [] Jones Chapel Road which [was] not where the [D]efendant lived." Counsel testified that at the time of the pretrial hearing, the Defendant lived on "like Rabbit Drive or something."

The Defendant's wife testified that she was aware that the Defendant was ordered to have no contact with her while the domestic assault charges were pending. The Defendant's wife denied having lived with the Defendant while the no contact order was in effect. She testified that "for two weeks" after the December 26, 2009 incident, she lived with her sister and then she "moved into our old trailer" on "Rabbit Street." The Defendant's wife testified that the trailer was "five minutes" away from her parents' home on Jones Chapel Road. She went on to testify that she lived in the trailer until the Defendant sold it and she had to move out in early November 2010. Then the Defendant's mother "let [her] stay in [a] camper that she had."

The Defendant's wife testified that she was living in the camper at the time of the trial for the domestic assault charges. She testified that the Defendant's mother picked her up and took her to the courthouse for the trial. The Defendant's wife stated that she did not know why her father told the prosecutor on the morning of the trial that she and the Defendant were on their way but that they were running late. She denied coming to the courthouse with the Defendant that morning and testified that the only time she had contact with the Defendant

was when the prosecutor permitted her to speak with him about a plea deal. The Defendant's wife testified that as of December 2010, she was living with the Defendant.[2]

The Defendant's mother, Mary Meadows, testified that the last time the Defendant and his wife lived together was in December 2009. Ms. Meadows testified that she "didn't keep up with" the Defendant's wife and thought that she had lived with her father for most of the time the no contact order was in effect. Ms. Meadows then testified that a few months prior to the hearing, the Defendant's wife "said she was homeless and she asked [her] if she could live in the camper." Ms. Meadows stated that she bought the camper three months prior to the hearing. According to Ms. Meadows, the Defendant lived at her house while the no contact order was in effect. However, on cross-examination by the Defendant, Ms. Meadows admitted that he stayed with her "for a brief period of time" after the December 26, 2009 incident. Ms. Meadows also admitted that the Defendant "[w]as back and forth" between her home and the trailer he owned.

Ms. Meadows testified that on the day of the trial for the domestic assault charges, she drove the Defendant's wife to the courthouse. According to Ms. Meadows, the Defendant's wife did not have a car and had no way of getting to the courthouse that morning. Ms. Meadows testified that the Defendant drove himself to the courthouse in a car borrowed from a friend. Ms. Meadows also testified that she "brought [the Defendant's wife] early" but she did not know why the Defendant's wife did not arrive at the District Attorney's office until after 8:30 a.m. The Defendant's wife was recalled and explained that she was late arriving to the District Attorney's office because she "went to Burger King" to get something to drink.

Monty Elswick, the father of the Defendant's wife, testified that on the day of the trial, he told the prosecutor that his daughter and the Defendant "would come together" because he "thought they were," but he "didn't know." Mr. Elswick testified that his daughter stayed with him one night after the December 26, 2009 incident, and then she went to live with the Defendant's sister. Mr. Elswick further testified that he "assumed" his daughter and the Defendant "were staying together because she" went to stay with the Defendant's sister. Mr. Elswick stated that he did not know if he had "personal knowledge of any contact" between his daughter and the Defendant. Mr. Elswick then admitted that he may have seen his daughter and the Defendant together on one occasion. Mr. Elswick explained that his daughter's children lived with him because his daughter had "a drug problem." According to Mr. Elswick, his daughter would stop by his house on random occasions to see the children. Because his daughter did not drive, someone had to drive her to Mr. Elswick's

---

[2]At the February 2, 2011 hearing, the Defendant stated that he was no longer living with his wife. The Defendant's wife had been subpoenaed to attend that hearing but she did not appear.

house.  Mr. Elswick testified that on one occasion, he saw the Defendant in a van outside his house while his daughter visited the children.  However, Mr. Elswick also testified that he "couldn't say positively that [the Defendant] was with [his daughter]."

Judy Elswick, the mother of the Defendant's wife, testified that after the incident in December 2009, and prior to the November 29, 2010 trial, the Defendant would drive her daughter to her home and drop her off to visit with the children.  According to Ms. Elswick, her daughter "would get out [of the vehicle] and come in [the house] and then later [the Defendant would] come back and get her or something like that."  Ms. Elswick testified that she saw the Defendant with her daughter when he dropped her off at Ms. Elswick's home.  Ms. Elswick testified that she could not recall what type of vehicle the Defendant was driving, but said "they've had a van."  On cross-examination, Ms. Elswick testified that after the trial, her daughter "bought one of the vans" after receiving "her settlement."  Ms. Elswick was never asked if the van bought after the trial was the one she saw the Defendant driving.  Ms. Elswick also testified that prior to the trial, her daughter took her to see the camper she was living in.  According to Ms. Elswick, her daughter told her that the Defendant was living there as well.  However, Ms. Elswick did not see the Defendant at the camper because "[h]e was in the camper" when she drove by it.  Ms. Elswick also testified that the Defendant and her daughter had been to her house together after the trial.

After hearing the testimony of counsel, the Defendant's wife, and Ms. Meadows, the trial court stated that it "would be very difficult for me to find beyond a reasonable doubt" that the Defendant violated the no contact order.  However, the trial court granted the State a continuance to subpoena Mr. and Ms. Elswick, the victim's parents.  After the conclusion of all the proof, the trial court determined that it "seemed to be pretty clear" that the Defendant and his wife had contact prior to the domestic assault trial.  The trial court chose to accredit the testimony of Mr. and Ms. Elswick over the testimony of their daughter and convicted the Defendant of one count of indirect criminal contempt.  The trial court ordered the Defendant to serve ten days in jail but did not impose a fine.  On March 31, 2011, the trial court entered a written order detailing its findings and judgment.  This appeal followed.

ANALYSIS

The Defendant contends that the evidence was insufficient to sustain his conviction.  The Defendant argues that the only evidence that he had contact with his wife was the testimony of her parents.  The Defendant argues that this incident had to be outside the "time frame" of the no contact order because the van "was purchased . . . after the trial."  The Defendant also contends that the State failed to establish that his contact was willful.  The State responds that Mr. and Ms. Elswick were both clear that the Defendant drove their

-4-

daughter to their house prior to the trial. The State concludes that this was sufficient evidence for the trial court to find that the Defendant violated the no contact order.

On appeal, this court applies the same standard of review to criminal contempt cases as it applies in other criminal proceedings. Black v. Blount, 938 S.W.2d 394, 399 (Tenn. 1996). Therefore, the Defendant must establish that no "reasonable trier of fact" could have found the essential elements of contempt beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979). Likewise, the verdict of the trial court in a bench trial is entitled to the same weight on appeal as a jury verdict. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978). Therefore, this court does not reweigh the evidence; rather, it presumes that the trial court has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the trial court. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support" the conviction. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Tennessee courts are empowered to "inflict punishments for contempts of court" based upon the "willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts."[3] Tenn. Code Ann. § 29-9-102. A criminal contempt is indirect when the contemptuous conduct was not committed in the judge's presence. See Tenn. R. Crim. P. 42(a). The accused in an indirect criminal contempt proceeding must be afforded notice of the charge and a hearing. Tenn. R. Crim. P. 42(b). If the trial court finds the defendant guilty of indirect criminal contempt, it must enter an order setting the punishment. Tenn. R. Crim. P. 42(b)(5). Criminal contempt does not "require initiation by an indictment or presentment, and there is no right to a trial by jury." Moody v. Hutchison, 159 S.W.3d 15, 27 (Tenn. Ct. App. 2004)

As in a normal criminal proceeding, the guilt of the accused in a criminal contempt case must be established beyond a reasonable doubt. State v. Aaron Bonding Co., No. M2009-02242-CCA-R3-CD, 2011 WL 1222036, at *9 (Tenn. Crim. App. Mar. 30, 2011).

---

[3] We also note that Tennessee Code Annotated section 40-11-150(i)(2) states that a violation of the release conditions of bail "shall be punished as contempt of the court imposing the conditions."

The court must also find that the defendant's misbehavior, disobedience, resistance, or interference was willful. Ahern v. Ahern, 15 S.W.3d 73, 79 (Tenn. 2000). A person acts willfully[4] when the person "acts intentionally with respect to the nature of the conduct . . . when it is the person's conscious objective or desire to engage in the conduct . . . ." Tenn. Code Ann. § 39-11-302(a). This court should review the proceedings below "as a whole" to ensure that the trial court applied the correct burden of proof. Aaron Bonding Co., 2011 WL 1222036, at *9.

Contempt proceedings were initiated against the Defendant after his counsel made repeated statements that the Defendant and his wife were living together in violation of a no contact order from the trial court. Additionally, Mr. Elswick also represented to the District Attorney's office that the Defendant and his wife were traveling to the courthouse together on the day of the domestic assault trial. However, the Defendant's wife testified that she had no contact with the Defendant other than one conversation permitted by the prosecutor. Counsel testified that he was mistaken when he stated to the trial court that the Defendant's wife and the Defendant were living together. Likewise, Mr. Elswick testified that he had assumed the Defendant and his wife were traveling to the courthouse together and he had no actual knowledge if this was true.

However, both Mr. and Ms. Elswick also testified that the Defendant drove their daughter to their house while the no contact order was in effect. Mr. Elswick was somewhat equivocal in his testimony, but Ms. Elswick was clear that she saw the Defendant drop off their daughter at their house on several occasions while the no contact order was in effect. The Defendant argues that Ms. Elswick was wrong because the van she saw him driving was not purchased until after the domestic assault trial. Ms. Elswick actually testified that she could not remember what the Defendant was driving. Ms. Elswick further testified that she recalled that the Defendant owned a van and that her daughter purchased "one of the vans" after the trial. However, Ms. Elswick was never asked if the van purchased after the trial was the same as the one she may have seen the Defendant driving to her house. The trial court chose to accredit Mr. and Ms. Elswick's testimony over that of their daughter and resolved any conflict regarding what vehicle the Defendant drove to their house in favor of the State. We will not disturb these choices on appeal.

With respect to the Defendant's mental state, the Defendant signed the no contact order as a condition of his bail. Everyone at the contempt hearing testified that they were aware of the no contact order, including the Defendant's wife. Despite this, the Defendant violated the no contact order by driving his wife to her parents' house on at least one

_____

[4]This court has generally equated the mental state of "willful" with that of "intentional." See State v. Electroplating, Inc., 990 S.W.2d 211, 221 n.9 (Tenn. Crim. App. 1998).

occasion. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for one count of indirect criminal contempt.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE