# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 21, 2014 Session

## DANIEL P. ROUSOS v. KRISTI BOREN (f/k/a ROUSOS)

**Direct Appeal from the Chancery Court for Williamson County**
**No. 33530      Robbie T. Beal, Chancellor**

---

**No. M2013-01568-COA-R3-CV - Filed August 26, 2014**

---

This appeal arises out of contentious post-divorce proceedings. The parties had equal parenting time with their three sons. Both parents filed a petition to modify the parenting plan and sought to be named primary residential parent. The parties also filed competing petitions for contempt. Following a five-day trial, the trial court named Father the primary residential parent of the oldest son, but it continued the parties' equal parenting arrangement for the two younger sons. The trial court found Father guilty of two counts of criminal contempt. The court also made an award of attorney's fees to Mother. Both parties appeal. We dismiss the appeal of the contempt order for lack of a final judgment. We affirm the custody order, vacate the award of attorney's fees, and remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part, Dismissed in Part and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Helen Sfikas Rogers, Siew-Ling Shea, Nashville, Tennessee, for the appellant, Kristi L. Boren (f/k/a Rousos)

Joanie L. Abernathy, Franklin, Tennessee, for the appellee, Daniel P. Rousos

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Daniel P. Rousos ("Father") and Kristi L. (Rousos) Boren ("Mother") were previously married and had three sons. Father and Mother were divorced by the Williamson County Chancery Court on May 5, 2009. At the time of the divorce, the parties' three sons were ages six, eight, and eleven. The parties agreed upon a parenting plan that named Mother as primary residential parent. Less than a year later, the parties agreed upon an amended parenting plan that granted both parents equal time with the children: 182.5 days per year, with parenting time alternating weekly, and exchanges being made on Mondays. The parenting plan stated, "Each party is the Primary Residential Parent of [all three children]." The trial court approved and entered this amended parenting plan in March 2010.

In February 2011, the parties began litigating issues regarding child support, contempt, and where the children would attend school. In April 2011, there was a physical altercation involving Father, Mother, and Mother's husband ("Stepfather"), at a hockey rink following the oldest son's hockey game. The parties dispute whether Father or Stepfather initiated the physical contact. In July 2011, the parties entered into an agreed order providing for a mutual restraining order, stating that Mother and Father "will communicate on parenting issues concerning the minor children only as to the factual issues absolutely necessary to be communicated between the parents and this communication shall only take place via e-mail and text message." The order allowed "for social contact between the parents to allow for contact at school or sporting events provided that the parents maintain a distance of at least ten (10) feet from each other at those events." The agreed order resolved other outstanding issues between the parties, but they were unable to agree where the oldest son would attend middle school, so the trial court entered an order resolving that issue.

The parties stayed out of court for about six months, until Father filed a petition to modify the parenting plan in February 2012. In his petition, Father sought to be named primary residential parent with regard to the oldest son, who was fourteen years old at the time, but he asked that the current schedule of equal parenting time remain in effect for the two younger boys. Father cited several changed circumstances since the entry of the agreed upon parenting plan providing for equal parenting time, including, but not limited to, the development of a strained relationship between Mother and Father that caused the children strife, and the oldest son's expressed preference to live primarily with Father. Mother responded with a counter-petition seeking to be named primary residential parent for all three children. She admitted that a material change in circumstances had occurred and that the children had been exposed to the strife between the parties. Mother alleged that Father hated her to the point that co-parenting was no longer possible. Father subsequently amended his

-2-

petition to modify the parenting plan and sought to be named primary residential parent of all three children.

Father filed a petition for criminal contempt against Mother, alleging ten separate counts of contempt for various alleged violations of the parenting plan. Mother filed a petition for civil and criminal contempt against Father, and later an amended petition, alleging twelve counts of contempt against Father. Father later filed a second petition for criminal contempt against Mother, alleging twenty-two new counts of contempt against Mother.

A five-day trial was held in April 2013. The criminal contempt petitions were set to be heard first. However, it was undisputed that Mother had not been properly served with the second petition for contempt filed by Father. As a result, the hearing on Father's petitions for contempt against Mother was postponed indefinitely until the matter could be reset on the court's calendar. The petitions for criminal contempt filed by Mother against Father were heard first, as scheduled. At the conclusion of the testimony, the trial court found Father guilty of two of the nine counts of criminal contempt originally alleged – one, for making derogatory comments about Mother; and two, for violating the mutual restraining order by approaching Mother's vehicle and having a verbal conversation with her about a medication prescribed for one of the children. The remaining counts were dismissed. The trial court sentenced Father to ten days of incarceration for each sustained count, which would be suspended after he served a total of 48 hours. However, the trial court also ruled that Father's jail sentence would be stayed until the hearing could take place on Father's petitions for contempt against Mother.

The trial court then proceeded to hear the parties' competing petitions to modify the parenting plan, along with testimony related to the counts of civil contempt against Father. As stated before, by the time of trial, both parents were seeking to be named primary residential parent of all three boys. The children were, by that time, ages ten, twelve, and fifteen. Both parents had remarried. Father's wife ("Stepmother") had a four-year-old son from a previous marriage who lived with her and Father. She and Father were also expecting twins. Mother and Stepfather had a two-year-old child of their own, and Stepfather had two children from a previous marriage who lived with him and Mother. Stepfather's son was fifteen years old and his daughter was twelve years old. Thus, in either home, there would be three additional children aside from the three sons at issue in this case. Mother's mother also lived in the home with Mother and Stepfather. Mother was a stay-at-home mom, and Stepfather was an engineer. Father was a senior systems engineer for a large IT company and earned a six figure salary. He generally worked from a home office. His wife was a registered nurse. The parties lived in neighboring towns just a few miles apart.

The trial court heard testimony from numerous witnesses, including Mother, Father, the two oldest children, Stepfather, Stepmother, two therapists who had counseled the children, one therapist who had treated Mother, a soccer coach, a hockey coach, a teacher, and three family friends. During closing arguments, Father's attorney announced that Father was no longer seeking to be named primary residential parent of the two younger children, and that he wished to continue the equal parenting arrangement for those children, in accordance with the preference of the middle child, which he had expressed in court. Accordingly, the trial court was left with Father's request to be named primary residential parent of the fifteen-year-old son, and Mother's request to be named primary residential parent of all three sons.

At the conclusion of the five-day trial, the trial judge orally announced his decision with a very detailed and lengthy explanation of his reasoning. The court named Father as primary residential parent of the oldest son, and it continued equal parenting time for the two younger sons, although Mother was designated as their primary residential parent.[1] As for the precise details of the parenting schedule, the two younger children would continue with alternating weeks, and exchanges on Mondays, with one parent taking the children to school that morning and the other picking them up. The parenting schedule for the oldest son provided for him to have residential parenting time with Mother every other Thursday after school until Monday morning when he returned to school. Thus, in practice, all three sons would be together at Father's house for one week; then, the two younger sons would return to Mother's house for one week beginning on Monday, while the oldest son would remain with Father until Thursday of that week. All three children would then be together at Mother's home every other Thursday until Monday.

Regarding the allegations of civil contempt against Father, which were based upon his alleged failure to pay uncovered medical expenses and failure to provide to Mother the attachments and schedules for his tax returns, the trial court concluded that he had purged himself of contempt after the filing of the petition but before trial. In his oral ruling at the

---

[1] Tennessee's statutes require the designation of a primary residential parent. **Hopkins v. Hopkins**, 152 S.W.3d 447, 450 (Tenn. 2004) (citing Tenn. Code Ann. § 36-6-402(5) (2001)). Tennessee Code Annotated section 36-6-402(4) defines the primary residential parent as "the parent with whom the child resides more than fifty percent (50%) of the time." "[E]ven though there may be no primary residential parent in fact, the law requires the designation of one parent as the primary residential parent[.]" **Brown v. Brown**, No. E2011-00421-COA-R3-CV, 2012 WL 1267872, at *7 (Tenn. Ct. App. Apr. 13, 2012) (citing *Cummings v. Cummings*, M2003-00086-COA-R3-CV, 2004 WL 2346000 (Tenn. Ct. App. Oct. 15, 2004)). In other words, the trial court must designate the role of primary residential parent to only one of the parents; however, the designation does not necessarily require alteration of an equal division of parenting time. **Id.** (citing *Estes v. Estes*, No. M2010-02554-COA-R3-CV, 2011 WL 4729862, at *8 (Tenn. Ct. App. Oct.7, 2011)).

conclusion of the trial, the judge stated that he would consider the fact that Father did not purge himself of the civil contempt until after the petitions for contempt were filed "for purposes of eventually awarding attorney's fees."

Pursuant to Tennessee Rule of Civil Procedure 54.02, Mother filed a motion to "sever" the custody action from the contempt petitions so that she could proceed with an appeal of the custody decision. She also filed a motion to alter or amend, challenging numerous particular rulings made by the trial court and asking the trial court to make an award of attorney's fees. Mother claimed that because "virtually every issue" in the case had been opposed, the costs of the litigation had been "enormous." She submitted a fee affidavit indicating that she had incurred $178,520.49 in attorney's fees and costs, and she asked the trial court to award her that amount.[2] Father also sought an award of attorney's fees, and the fee affidavit he submitted indicated that he had incurred $57,145 in fees and costs for the civil case.

The trial court granted Mother's motion to sever the custody action from the contempt matters and stated in its order that once it ruled upon the issue of attorney's fees, "that ruling will be a final and appealable order on the modification of the parenting schedule." The trial court partially granted Mother's motion to alter or amend and awarded Mother $25,000 "to reimburse her necessary expenses in prosecuting the contempt Petitions." Mother then filed a notice of appeal of the trial court's orders regarding custody and attorney's fees. Father filed a notice of appeal of the trial court's orders regarding contempt and attorney's fees. The trial court denied a motion to stay filed by Mother.

## II.  ISSUES PRESENTED

Mother's brief on appeal lists the following issues for review, which we have slightly reworded:

1.     Whether the trial court erred in giving the testimony of the oldest son "great weight" and giving the testimony of the children's psychologist too little weight;

2.     Whether the trial court erred in naming Father primary residential parent of the oldest son after it made numerous findings regarding Father's negative behavior;

3.     Whether the trial court erred in significantly reducing Mother's parenting time with the oldest son by 72.5 days per year;

---

[2]  The fee affidavit indicated that the attorney's fees attributable to prosecuting and defending the criminal contempt charges totaled $13,700.

4. Whether the trial court erred in continuing equal parenting time for the parties' two younger sons;

5. Whether the trial court erred in giving Father sole decision-making authority on major educational decisions and non-emergency healthcare decisions;

6. Whether the trial court should have required Father to pay Mother's attorney's fees for the custody modification proceedings;

7. Whether the trial court should have awarded Mother all of her attorney's fees for having to prosecute petitions for civil contempt against Father regarding his failure to pay medical bills and failure to provide complete copies of his income tax returns when he did not purge his contempt until after the petitions were filed; and

8. Whether Mother should be awarded her attorney's fees on appeal.

Father argues on appeal that the trial court's parenting plan should be affirmed. However, he argues that the trial court erred by failing to require Mother to pay his attorney's fees in connection with the custody modification proceedings. Father also argues that the trial court erred in finding him guilty beyond a reasonable doubt on two counts of criminal contempt. Finally, Father seeks an award of his attorney's fees on appeal.

### III. DISCUSSION

#### A. Contempt

At the outset, we will address Father's attempt to challenge the trial court's finding that he was guilty of two counts of criminal contempt.

"A judgment of contempt fixing punishment is a final judgment from which an appeal will lie." *Hall v. Hall*, 772 S.W.2d 432, 436 (Tenn. Ct. App. 1989) (citing *State v. Green*, 689 S.W.2d 189 (Tenn. Cr. App. 1984)). "A judgment on contempt becomes final upon entry of the judgment imposing a punishment therefore."[3] *State ex rel. Garrison v. Scobey*,

---

[3] "It matters not that the proceedings out of which the contempt arose are not complete." *Moody v. Hutchison*, 159 S.W.3d 15, 31 (Tenn. Ct. App. 2004) (citing *Green*, 689 S.W.2d at 190). "[A]ny order that imposes punishment upon a petition for contempt is a final appealable order in its own right, even though the proceedings in which the contempt arose are ongoing." *Coffey v. Coffey*, No. E2012-00143-COA-R3-CV, 2013 WL 1279410, at *5 (Tenn. Ct. App. 2013) (citing *Bailey v. Crum*, 183 S.W.3d 383, 387 (Tenn. Ct. App. 2005)).

-6-

No. W2007-02367-COA-R3-JV, 2008 WL 4648359, at *4 (Tenn. Ct. App. Oct. 22, 2008) (citing *Green*, 689 S.W.2d at 190); *see also* **Rose v. Rose**, No. E2005-01833-COA-R3-CV, 2006 WL 1132086, at *4 (Tenn. Ct. App. Apr. 27, 2006) ("a judgment of contempt, summary or otherwise becomes final upon the entering of punishment therefor"); **Bailey v. Crum**, 183 S.W.3d 383, 387 (Tenn. Ct. App. 2005).

Consequently, "a judgment of contempt without the designation of punishment is not a final appealable judgment." **Hall**, 772 S.W.2d at 436 (citing Tenn. R. App. P. 3(a); 17 C.J.S. *Contempt* § 114, p. 301; 4 Am.Jur.2d *Appeal and Error* § 170, p. 683). For example, in **Hall**, an order finding a party in contempt but stating that punishment was "withheld at this time" was deemed a non-final order. *Id.* Likewise, in **Fletcher v. Fletcher**, No. W2003-00715-COA-R3-CV, 2004 WL 298370, at *7 (Tenn. Ct. App. Feb. 11, 2004), we held that an order was not a final, appealable judgment where it found a party in contempt but did not designate punishment for the party's failure to comply with the court's orders. As these cases demonstrate, "the mere adjudication of contempt by the trial court is not a final, appealable order." **Long v. Long**, No. 01A01-9406-CV-00270, 1995 WL 33741, at *3 (Tenn. Ct. App. W.S. Jan. 27, 1995).

In the case at bar, the trial court found Father guilty of two counts of criminal contempt, and it sentenced him to ten days of incarceration for each sustained count, which would be suspended after he served a total of 48 hours. However, the trial court also ruled that Father's jail sentence would be "stayed" until the hearing could take place on Father's petitions for contempt against Mother. The trial judge explained his decision to stay Father's jail sentence at the conclusion of the hearing:

> With regard then, however, to the 48 hours, the 48-hour sentence is appropriate, and the Court stands by that decision, but I don't believe that it should be served immediately or otherwise. The reason for that is because, rightly or wrongly, we do have cross-complaints here. I don't believe that the Court should consider his punishment in a vacuum.
>
> If he has significant contempt issues against the wife, the ex-wife, the Court believes that that is – that that should be considered with regard to the imposition of any jail sentence. In other words, if the Court finds that the wife has engaged in like misconduct, then perhaps the sentences of the Court should just be a wash, that both parties have engaged in contemptuous conduct, and the court wants to take a hands-off approach and not punish anybody with jail time.
>
> If the Court believes that the conduct of both the wife and the husband

merit the same general punishment, and both should go to jail at the same time, the Court may well do that. If the Court finds that the conduct of the wife is so egregious that it far overshadows anything that the husband had done, the Court may just suspend the remainder of the 48 hours because of the wife's conduct.

If the Court finds that the wife hasn't engaged in any bad conduct at all, the Court stands by its 48-hour decision and will place him in jail for 48 hours, but I don't believe that the Court needs to sentence Mr. Rousos in a vacuum without at least hearing the contemptuous allegations made against Ms. Boren.

So all that to say, the 48 hours is a sentence. It's in place. It's being stayed until the Court can at least address the contempt issues that have been alleged against the – against the wife.

As we explained before, the hearing on Father's petitions for contempt against Mother was postponed indefinitely, and according to the briefs on appeal, the matter remains pending to this day. As we see it, then, the trial court has not yet made a final decision on the appropriate punishment for Father's criminal contempt.

Due to the interlocutory nature of the trial court's decision with regard to Father's punishment, we find that the trial court's order finding Father in criminal contempt is not a final, appealable order at this time. Thus, Father's issue pertaining to criminal contempt is not properly before the court and will not be reviewed in this appeal.[4]

### B. Parenting Issues

The next five issues, presented by Mother, relate to the trial court's modification of the parenting plan.

"In assessing a petition to modify a permanent parenting plan, the court must first determine if a material change in circumstances has occurred[5] and then apply the 'best interest' factors of section 36-6-106(a)." *Armbrister v. Armbrister*, 414 S.W.3d 685, 697-98

---

[4] *See* **Fletcher**, 2004 WL 298370, at *7 (dismissing the appeal of a contempt order where punishment was not yet imposed, but proceeding to consider the appeal of the trial court's order on alimony).

[5] The parties agreed at trial that a material change in circumstances had occurred since the entry of the 2010 parenting plan in which they agreed to equal parenting time. Neither party challenges the trial court's finding that a material change in circumstances had indeed occurred.

(Tenn. 2013) (citing Tenn. Code Ann. § 36-6-101(a)(2)(B)–(C) (2010), –106(a) (2010 & Supp. 2013)). "[P]ursuant to the modification procedures described in section 36-6-405(a), the court must apply the fifteen factors of section 36-6-404(b), so as to determine how, if at all, to modify the residential parenting schedule." *Id.* at 698. The two analyses are likely to be quite similar, *id.*, as there is "little substantive difference" between the factors applicable to parenting plans, set out in section 36-6-404(b), and the factors applicable to custody determinations, set out in section 36-6-106(a), as far as determining comparative fitness and the best interest of the child. *Dobbs v. Dobbs*, No. M2011-01523-COA-R3-CV, 2012 WL 3201938, at *1 n.1 (Tenn. Ct. App. Aug. 7, 2012). "'In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child,'" consistent with the enumerated statutory factors, "as well as 'the location of the residences of the parents, the child's need for stability and all other relevant factors.'" *Armbrister*, 414 S.W.3d at 693-94 (citing Tenn. Code Ann. § 36-6-106(a) (Supp. 2013)).

In the case before us, the trial court analyzed the statutory best interest factors of Tennessee Code Annotated section 36-6-106 and found that most of the factors were equal between the parties. The court found that "both parents truly do love the children and both have strong emotional ties to their children," and "both parents are in a generally equal position to provide the necessities for the children; neither parent would be able to better provide in a significant or material way." The court found that both parents had "played an equal role in caring for the children" since the entry of the 2010 parenting plan providing for equal time, "and the children live in a stable environment." The court found that, "because of both parents, the children are active in their community and do extraordinarily well in school." The court found that "both parents have extended families who are very involved in the children's lives[.]" The court had no concerns about physical abuse or any potential harm from persons residing in the parents' homes. Both parents were mentally and physically healthy, the court found. However, the trial court also found that "the parties are absolutely incapable of dealing with each other on a mature basis." The evidence supports the trial court's findings as to each of these factors.

The statutory factor that tipped the scale in Father's favor with regard to the oldest son was "[t]he reasonable preference of the child if twelve (12) years of age or older."[6] Tenn. Code Ann. § 36-6-106(a)(7). The statute provides that "[t]he preferences of older children should normally be given greater weight than those of younger children." *Id.* Mother argues on appeal that the trial court gave too much weight to the testimony of the fifteen-year-old son and too little weight to the testimony of the clinical psychologist who had been

---

[6] The statute provides that "[t]he court may hear the preference of a younger child on request[.]" Tenn. Code Ann. § 36-6-106(a)(7).

counseling the children, Joseph LaBarbera, Ph.D. Therefore, we will briefly recount their testimony.

Dr. LaBarbera had been counseling the children for the past eight months, during which time he saw the oldest son fourteen times, the middle son thirteen times, and the youngest son eight times. Dr. LaBarbera testified that the oldest son complained repeatedly during the course of his treatment about being "in the middle" of family pressure. He said the oldest son "made very clear that he's on his father's side. He announced this during my first meeting, and he never changed." Dr. LaBarbera said "there was a consistent pattern" and the oldest son was "quite repetitive" indicating "very clearly" that he wanted Father to have primary custody. He said the oldest son acknowledged, though, that a 50/50 arrangement might be the only way that his parents would stop hating each other. It was Dr. LaBarbera's opinion that the oldest son was very attuned to the needs of Father and felt responsible for Father's happiness. According to Dr. LaBarbera, the oldest son felt that Mother abandoned Father. The oldest son indicated to Dr. LaBarbera that Father was still angry about Mother leaving him for a neighbor. He said the oldest son expressed "deep concern" about being around Stepfather and was worried and uncomfortable when he was around him. According to Dr. LaBarbera, the oldest son wanted no role in the trial of this matter because he did not want to testify negatively about either parent. Thus, Dr. LaBarbera was of the opinion that none of the children should be allowed to testify because it would again place them "in the middle." He said the children had "experienced attempted influence by one parent, at least the older two, and the truth is that I don't think they're capable of communicating what they truly feel as opposed to what they've been communicated to feel."

Dr. LaBarbera testified that the three children were struggling with a general awareness that their parents were "at war." He said another burden on the children was Father's "boundary issue" pertaining to his negativity about Mother. Dr. LaBarbera emphasized that he had not evaluated Father. Nonetheless, from what he had learned about Father from the children, his impression was that Father had a great deal of negative feelings toward Mother related to the divorce. As Dr. LaBarbera put it,

This is not the business of the children, and although it is his choice as to whether he is going to hate his wife – ex-wife or feel neutral about her, that's up to him. But I believe that we get into a boundary issue when there's a – an attempt to promote the children's sharing that attitude toward their mother. The kids are entitled to have positive attitudes toward both parents, and I think the task for each parent is to promote that, regardless of the negative feelings we might as individuals have toward our former spouses.

Dr. LaBarbera said Father's negativity caused the children to feel burdened or pressured at times. When asked if Father's negativity had actually undermined the children's relationships with Mother, Dr. LaBarbera replied, "Interestingly, to some degree, but maybe not dramatically." When asked if he had seen evidence of parental alienation in this case, Dr. LaBarbera said,

> I think there are elements of parental alienation in the sense of a – an effort by one parent, namely the father, to influence the children in a direction that is not in their best interests by way of devaluing the mother. I think where it falls short is I don't think the effort has been as successful as we might anticipate in true parental alienation. The kids have not truly been alienated from the mother. They seem to have been able to retain an openness to the mother as a person who they deal with and don't actively reject.

Dr. LaBarbera testified that Father did have positive attributes and was in many ways a good parent. Dr. LaBarbera said his sense about Father was that he is "capable of defining structure and applying appropriate consequences, that he is a strong parent." However, in Dr. LaBarbera's opinion, Father's "blind spot" was his negativity toward Mother. Dr. LaBarbera testified,

> One of the interesting things about doing this kind of work is to recognize that parents who love their children are often blind with respect to the impact of their own actions on their children, highly attuned to what maybe the other party is doing and inadequately attuned to the impact of their own actions. I think in this case we have an example of that.

Dr. LaBarbera conceded that Mother was not a perfect parent either and that she had work to do as far as co-parenting. He explained that her main issue was a need to address her great fear and anxiety about dealing with Father. He also said she was "probably sometimes too nice and may have difficulty laying down the law" for the children. For example, Dr. LaBarbera was aware that there had been problems with the oldest son sneaking out of Mother's house. However, Dr. LaBarbera placed more responsibility with Father for the problematic issues he had observed.

When Dr. LaBarbera was asked to name just one thing that could be done to help these children the most, he said,

> For [Father] to recognize the impact of the boundary violations that he's engaged in, to cease bringing the kids into the business of the adults, and to be supportive of the children having a full and supportive relationship with the

mother. That would be the main thing. Failing that, I would think that the best thing that would happen would be for the mother to have primary residential status.

Dr. LaBarbera explained that Father's boundary issue is a matter of choice and said that he believes that Father is capable of changing his behavior. Dr. LaBarbera said the children had told him that Father's negativity had already begun to diminish and that Father was no longer making negative statements about Mother. In sum, Dr. LaBarbera said,

> My recommendation is that the Court will make a judgment as to the likelihood of [Father] altering his parenting style. If the Court's view is that the behavior that's been manifested in the past will likely continue into the future, then I believe that that should be taken into consideration by the Court in terms of favoring the mother as a custodial parent.

He explained,

> A positive associated with spending less time with the father would be less time in the pressure cooker in terms of the children's exposure to the father's agenda. The downside would be less time spent with the father who in many ways is a competent and effective parent.

The oldest son was fifteen years old at the time of trial and a freshman in high school. The trial judge casually spoke with the oldest son after he took the stand and informed him that he did not have to state a preference as to a parenting arrangement and that he could tell the judge if he did not want to answer any specific question. The judge also informed the oldest son that he had been hearing testimony for several days, and although the judge would consider any preference the oldest son stated, the ultimate decision would not be based solely upon his preference. The trial judge mentioned the fact that, a couple of years earlier, the oldest son had testified before the court regarding his preference about where he would attend school. The oldest son replied that he "didn't have a problem with it the first time" and said that he was fine with being asked questions again. The oldest son testified that he had never told anyone that he felt pressured. He explained that what he said to Dr. LaBarbera was that he had no problem with speaking in court, but that he simply did not feel that he *needed* to speak in court. In any event, the oldest son testified that he did have a preference that he wanted the trial judge to be aware of. He said that neither parent had promised him anything for stating a certain preference, and neither had pressured him to feel the way that he did. The oldest son said he had not practiced his testimony and that Father had not talked with him about the questions he would be asked. He also said that he was not worried about stating his preference in front of either parent, and he did not feel that he was

under any pressure. He said he did, at one time, feel like he was in the middle of his parents' arguments, but after talking with people like Dr. LaBarbera, he realized he wasn't really in the middle, or at least not as much as he thought he was.

When asked to state his preference as to a parenting schedule, the oldest son replied, "I'd like to stay at my dad's a bit more." He testified that he first developed this preference about five years earlier, when he was around ten years old. The oldest son testified that he had discussed his preference with Father "pretty often," perhaps once a week, but he had never discussed his preference with Mother because he did not want to hurt her feelings. He testified that his preference had nothing to do with loving one parent more than the other; he simply felt that he had "more responsibility" at Father's house, such as various chores he mentioned, which he felt would help him "grow up to be better." He said he had no chores at Mother's house and that he needed "to just get better at doing stuff like that" and "take responsibility for my own things." He also testified that Father was "more academically involved," and he said he enjoyed running, hiking, and camping with Father. In addition, he testified that Father was more flexible with the parenting schedule than Mother, and he felt that Father would allow him to visit Mother if he asked. The oldest son also testified that he felt "a bit strange" being around Stepfather at Mother's house because, growing up, he knew Stepfather as his friend's dad. When asked about being away from his two younger brothers a few nights every other week, as the proposed parenting plan provided, the oldest son said he thought it would be good to get away from them for some time "because sometimes we just need some time apart." He explained that being apart would give them time to "cool down" from arguments. The oldest son testified that his younger brothers are "quite a handful" and do not "mind" as well at Mother's house, but they "know they're going to get in trouble at my dad's house if they do something wrong." The oldest son testified that it was Father who discovered that he was sneaking out of Mother's house, and he said that Father suggested a punishment that Mother deemed too harsh. According to the oldest son, Mother did not punish him at all for sneaking out of the house. When asked about the strength of his preference to live primarily with Father, the oldest son said, "I do want to spend more time with him a lot, I mean. I've been asking for a while, I mean. And I feel like he just understands what I – what I want." He said Father "just seems like he understands me, like just knows what I need and stuff more." The oldest son said he likes the relationship that he has with Father. He said Father showed him the petition to modify, and the oldest son felt that "[i]t was everything that I had asked for." He said he was "glad that [Father] had gotten it done" and "[i]t just showed that he had actually listened to what I wanted." The oldest son said he would be "very disappointed" if the trial judge did not allow him to live primarily with Father.

The oldest son described the relationship between Mother and Father as "not a good one." Still, he claimed that Father's negative statements about Mother did not cause him

worry or concern because Father had stopped saying negative things about Mother "a long time ago," and he never really paid attention to it in the first place. The oldest son testified that Mother made negative statements about Father as well, and when asked which parent makes the most negative statements, he said it was about the same.

The trial court found, in its written order, that "[the oldest son's] testimony to spend more time with Father was well thought out and appropriate and there is no reason for the Court not to give his testimony considerable and great weight." The trial court's oral remarks at the conclusion of the hearing were very detailed and lengthy, with the transcript spanning nearly fifty pages.[7] With regard to the testimony of the oldest son, the trial judge observed,

> [He] came in maturely, reasonably, and stated his reasons for wanting to go and reside with his father. They were well-thought-out. The Court has no reason to believe that he was bribed in some way to make his feelings known. He did, in the Court's opinion, lessen the issues that had been presented during counseling with the father. But, again, that was to get his ultimate point across of what his desires were. His preference was clear, and it holds great weight with – with the court.

The court went on to state that it must also consider whether any parental stress on the oldest son would require the court to discount his stated preference. The judge addressed the negativity between the parties and its effect on the preference of the oldest son:

> Another biggie, each parent's past performance with regard to shared parenting responsibilities. This is a problem. And, again, you know, I'm not saying anything that everybody doesn't acknowledge. The parties are absolutely incapable of dealing with each other on a mature basis.
>
> The father has provided way too much information to his children about the pending litigation. The father has engaged in manipulative behavior over his children that causes the Court great concern. The father has acted in a way towards the mother that was inappropriate, coercive, and intimidating.
>
> It's not all on the shoulders of the father. The mother hasn't exactly been 100 percent there either. I do believe that the mother has, on occasion, spoken

---

[7] The final order did not specifically incorporate the trial judge's oral remarks, but the trial judge prefaced his oral remarks by stating that he was going to give the parties a lengthy explanation of his decision because he was "required to justify any reasons that the Court has in making its decision." Thus, we have reviewed the oral ruling to the extent that it sheds light on the trial court's decision-making process.

to the father – spoken about the father inappropriately in front of the children. I think there is some proof to bear that out. But having said that – and, you know, I'm not the psychoanalyst here – but – but it's not something that we haven't seen before.

It would appear to the Court that the mother kind of started her new life. She – she took more responsibility over the children than what the father was generally used to. She pushed the father away to some degree. I'm not saying in a bad way. She just – that's life. I mean, she was growing away from the father. The father tried to tighten and tighten those reins because he felt he was losing control. And under the pretense of trying to co-parent effectively, by sending out email after email after email, what he was really doing was attempting to regain the authority and the power he had while the parent – while the parents were married, and he no longer had that authority or the power. And, unfortunately, it comes across very poorly, so . . .

The reason that it becomes important is because if there is anything that can defeat this Court's placing great weight on [the oldest son's] preference, it would be if I thought the father had engaged in such a coercive manner that would cause [the oldest son] to be alienated against the mother without good cause. And the fact is that I don't believe we have reached the level of what I would call "parental alienation." I don't believe that any of the experts suggested that we had – that we had reached that level. While they said that the father had demonstrated characteristics of that, I don't believe that any of the experts were prepared to state that [the oldest son] had basically been brainwashed or intimidated to the point of expressing an opinion that truly was not his own.

Again, was there – has the father manipulated those emotions by [the oldest son]? Yes. is the Court pleased about that? No. Do I believe that the manipulation occurred to such an extent that would cause the – that would cause the Court not to accept his statement of preference here? No. I just simply don't believe that that's true. For that reason, the Court is going to modify the parenting plan to some degree, not a lot, but I'm going to modify it to some degree as it relates to [the oldest son].

The trial judge reiterated that he did not want to "make light of the experts" or "undercut" their opinions, as he noted that Dr. LaBarbera was well-respected in his field. "But on the same token," the court said, "when a 15-year-old child comes in and sits between – before the parents and in the manner by which he made his opinion known with such certainty, the

Court does not believe that that was fabricated to appease a parent. The court believes that that was his desire, and I'm willing to give [the oldest son] the benefit of the doubt on that." In sum, the court said "I don't believe there's enough evidence for the Court – to cause the Court to believe that the father has so manipulated his son that the Court should disregard that child's opinion. Enough said about that."

Our Supreme Court recently described our standard of review in modification cases as follows:

> A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions. See *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings. [citations omitted].
>
> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey–Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court ... appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

*Armbrister*, 414 S.W.3d at 692-93.

Here, the trial court carefully examined the oldest son and discussed with him his desire to testify. Upon observing the oldest son's demeanor while testifying, the trial court concluded that the fifteen-year-old was mature, reasonable, and certain as to his desires. The judge also carefully considered whether the boy had been pressured, and he concluded that his testimony was not simply "fabricated to appease a parent." We are not inclined to second-guess the trial judge's cautious and well-reasoned analysis of these issues, which was obviously based upon the judge's assessment of the witness's credibility.

It is true that "due caution is in order in considering the testimony of a child on his preference in a custody matter." *Maxwell v. Woodard*, No. M2011-02482-COA-R3-CV, 2013 WL 2420500, at *18 (Tenn. Ct. App. W.S. May 31, 2013). This Court has previously recognized the various problems that can arise in this context, "such as children deciding 'they would rather live with the more lenient or generous parent rather than the one who just refused to buy the newest must-have item or who set rules the child did not agree with.'" *Id.* (quoting *Costley v. Benjamin*, No. M2004-00375-COA-R3-CV, 2005 WL 1950114, at *16 (Tenn. Ct. App. Aug. 12, 2005)). Even more troublesome, "a parent may, intentionally or unintentionally, force a child to choose sides or pressure a child into expressing a preference." *Id.* (citing *Costley*, 2005 WL 1950114, at *19). "Appropriate caution should not, however, prevent a trial court from giving due weight to a child's testimony where his preference is not motivated by such factors." *Id.* Interestingly, this was not a situation where a fifteen-year-old boy was simply wanting to live with the more "lenient" parent rather than the parent who set harsh rules to which the child objected. Instead, the oldest son was eager to have more responsibility at Father's home, and he seemed to appreciate the fact that Father's home offered him a more structured environment and more academic support.[8] The oldest son gave clear and legitimate reasons for wanting to spend more time at Father's house. Furthermore, the trial judge concluded that the fifteen-year-old's stated preference was his own. "Where the trial court is reasonably satisfied that the child has not been manipulated and the child's reasons for his preference are not frivolous, it is permissible, indeed important, to give significant weight to the child's testimony on the parent with whom he wants to live." *Maxwell*, 2013 WL 2420500, at *19.

It is also worth noting that the oldest son did not vilify Mother during his testimony. "If the child's testimony had been totally negative about Mother, this might support Mother's

_____

[8] Mother questions whether Father can provide academic support by suggesting on appeal that Father will not be able to help the oldest son with higher level math classes because, according to Mother, Father had poor math grades in school. At trial, she introduced Father's student progress reports going all the way back to middle school in an effort to prove that math was Father's worst subject. However, Father testified that, since that time, he had earned an engineering degree in electromechanical engineering with a minor in math. Therefore, we are confident that Father will be able to assist the oldest child with his assignments.

assertion that [the child] had been manipulated by Father." ***Maxwell***, 2013 WL 2420500, at *20; *see also **Costley***, 2005 WL 1950114, at *13 (describing parental alienation syndrome, where one parent seeks to alienate the child from the other parent, and the manipulated child adopts an extreme view of the targeted parent, saying only negative things about that parent). In this case, the oldest son emphasized that his preference as to a residential schedule did not mean that he loved Father more than Mother, and he acknowledged during his testimony that both of his parents love him and are proud of him.

We reject Mother's suggestion on appeal that the trial court ignored the testimony of Dr. LaBarbera. To the contrary, the trial judge expressly noted that he was disagreeing with Dr. LaBarbera's testimony to some extent due to the convincing nature of the oldest son's testimony, and he explained why. The trial judge did not believe that the oldest son's preference was fabricated or that the circumstances in this case had risen to the level of "parental alienation," and Dr. LaBarbera likewise testified that "[t]he kids have not truly been alienated from the mother." Mother characterizes Dr. LaBarbera's testimony as basically stating that she should have been named primary residential parent. However, we disagree with this characterization. Dr. LaBarbera testified that *if* the trial court was of the opinion that Father's past behaviors would continue into the future, *then* the court should take that into consideration in favoring Mother as primary residential parent. However, the one thing that Dr. LaBarbera said could help the children the most would be for Father to recognize his so-called "blind spot," stop bringing the children into the parents' business, and be supportive of the children's relationship with Mother. "Failing that," Dr. LaBarbera testified, Mother should be named primary residential parent. Dr. LaBarbera said that Father's boundary issue is a matter of choice, and he was of the opinion that Father is capable of changing his behavior. In fact, Dr. LaBarbera said the children had told him that Father's negativity had already begun to diminish and that Father was no longer making negative statements about Mother. Therefore, we do not find that the trial court's ruling ignored the testimony of Dr. LaBarbera. We also note, however, that the trial court was not bound by Dr. LaBarbera's recommendation. *See **Thurman v. Sellers***, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001) ("Expert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in character, and the trier of fact may place whatever weight it chooses on such testimony.").

For all these reasons, we find no merit in Mother's argument that the trial court erred by giving "too much weight" to the testimony of the oldest son. Mother also argues that the trial court should not have reduced Mother's parenting time with the oldest son by 72.5 days per year because the oldest son testified that he would like to stay with Father "a bit more." According to Mother, "a bit more" time might be an extra day each month, not 72.5 days a year. However, the oldest son elaborated on his preference and went on to state during his testimony that he proposed a schedule whereby he would stay with Father about six more

days per month. Obviously, that would equate to 72 days per year. Counsel for Mother also questioned the oldest son about whether he really wanted to spend two months of every year away from his younger brothers, and the oldest son indicated that he did. This issue is also without merit.

Mother also cites cases which have emphasized the importance of raising siblings together in the same household whenever possible and that "custody orders generally will not separate siblings in the absence of extenuating circumstances or evidence of potential harm." *Ateca v. Ateca*, No. M2007-02843-COA-R3-CV, 2009 WL 1138129, at *5 (Tenn. Ct. App. Apr. 27, 2009); *see also* **Maupin v. Maupin**, 420 S.W.3d 761, 775 (Tenn. Ct. App. 2013) ("Our court has recognized that separating siblings is a drastic remedy. Siblings are to be separated only if extraordinary facts in the case require it.") (quotation omitted); *Grover v. Grover*, No. 01A01–9804–CH–00197, 1999 WL 257653, at *6 (Tenn. Ct. App. Apr. 30, 1999) ("Generally speaking, siblings, following a divorce, have a right to spend their minority together in the absence of proof of potential harm to one of them or other extenuating circumstances.") "As this court has recognized on several occasions, a parenting schedule that separates siblings is discouraged; however, the best interests of the child should be the foremost consideration." *Strickland v. Strickland*, No. M2012-00603-COA-R3-CV, 2012 WL 6697296, at *14 (Tenn. Ct. App. Dec. 21, 2012) (citing *Rice v. Rice*, 983 S.W.2d 680 (Tenn. Ct. App. 1998)). The presumption against separating siblings "is not inflexible and must give way to other considerations in appropriate circumstances." *Ray v. Ray*, 83 S.W.3d 726, 738 n.11 (Tenn. Ct. App. 2001). "The preference for siblings to remain together is only one factor to consider in the court's determination of a child's best interest." *Richardson v. Richardson*, No. W2000-02374-COA-R3-CV, 2001 WL 687074, at *5 (Tenn. Ct. App. June 14, 2001) (citing *In re S.B.*, No. M1999-00140-COA-R3-CV, 2000 WL 575934, at *5 (Tenn. Ct. App. May 12, 2000)). "It is not a controlling factor." *In re S.B.*, 2000 WL 575934, at *5. When courts do separate siblings, "they should minimize the potentially harmful effects of this separation by including liberal visitation rights and other provisions enabling and encouraging the siblings to continue their relationship with each other." *Shofner v. Shofner*, 181 S.W.3d 703, 717 (Tenn. Ct. App. 2004) (citing *Ray*, 83 S.W.3d at 738; *Rice*, 983 S.W.2d at 685).

In this case, we find that the present schedule is in the best interest of the oldest son and justified by the overall circumstances. First of all, these three siblings were not "separated" in a drastic fashion. For the most part, they will continue to be raised in the same household. In each two week period, the three sons are together for eleven straight nights, and they are apart for only three nights. The siblings will most certainly maintain a close relationship. In addition, at each parent's house, the sons are surrounded by their half-siblings and step-siblings. Therefore, the oldest son is not alone at Father's house. He is with his four-year-old stepbrother and, presumably, by now, his twin half-siblings. At

Mother's house, there were two older step-children who were fifteen and twelve at the time of trial, in addition to a two-year-old half-sibling. Father testified that he had observed an increase in "sibling rivalry" between the oldest son and the two younger sons and some inappropriate aggressive tendencies. Father suggested that it could be "a real benefit" to the oldest son to have some time away from the "chaos" at Mother's house because the oldest son "really thrives on that kind of autonomy and one-on-one attention." He said that the oldest son gets very annoyed and frustrated with his younger brothers and that a "break" for a few days could be very beneficial to him. As we already noted, the oldest son similarly mentioned during his testimony that his younger brothers do not "mind" at Mother's house, that "time away is good just to kind of cool down," and "sometimes we just need some time apart." The children's previous counselor, from 2011 to 2012, likewise testified that one problem she addressed with them was an aggression issue between the oldest son and the two younger sons. She said that the situation had improved with sessions and the setting of guidelines regarding consequences for behavior, but aggression continued to be an issue from time to time thereafter. She also reported that one thing that was important to the oldest son was his desire to have more input about his residential parenting schedule "because sometimes he wanted to get away from his brothers and things like that." The trial court heard all this testimony and concluded that it was in the best interest of the oldest son to be away from his siblings for a limited time period every other week. The trial court's decision does not fall outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record, so as to constitute an abuse of discretion.

Next, Mother argues that the trial court erred in naming Father primary residential parent of the oldest son despite its findings that Father had engaged in manipulative and coercive behavior. Mother argues that the trial court's ultimate conclusion as to best interest is inconsistent with its findings regarding Father's behavior. As noted in the quote above, the trial court found that *both* parents "are absolutely incapable of dealing with each other on a mature basis." With particular reference to Father, the judge said during his oral remarks that he had "provided way too much information to his children about the pending litigation," "engaged in manipulative behavior over his children," and "acted in a way towards the mother that was inappropriate, coercive, and intimidating." The judge was quick to add, however, that it was "not all on the shoulders of the father." The trial judge also said that he does not "live in a vacuum" and indicated his understanding that it is difficult to field a child's questions about litigation without giving them too much information.[9] Still, the trial judge added, "that's been completely unproductive." The judge said that Father had "taken

---

[9] In addition to showing the oldest son the petition for modification, Father had shown him a surveillance video of the altercation between Father and Stepfather at the hockey arena, and he had shown the middle child a letter from Mother's attorney.

this family dynamic and you've escalated it beyond where it needs to be. And the fault does primarily lay with you as to the issues that these children have had." The court said it had heard "fairly damning proof" of "episode after episode after episode of you involving your children in legal issues that they have no business being involved in." He said, "And do I think – do I think you're the worst parent that ever walked in the courtroom? Not even close. Do I think that – do I think that you're potentially damaging your children? Yeah, I do."

The trial testimony was filled with endless examples of manipulative and immature behavior by both parties. Just to name a few, it was undisputed that Mother would routinely sign the children up for extracurricular activities without Father's knowledge or consent. Father would learn from the children that Mother had signed them up for a six-month hockey season with significant time commitments during his parenting time, or a soccer league in another town that required one-hour round-trip commutes for practices, or a grappling team that required two-hour training sessions two nights per week and travel events on Saturdays. Mother continued to enroll the children in these activities despite Father's express objections and in spite of the previous parenting plan's provision requiring joint decision-making for extracurricular activities. Father is a marathon runner, and he was planning to run with the oldest son in his first 5k race in December 2012. Mother signed up the oldest son for a Thanksgiving race without telling Father or giving him the opportunity to participate. The parenting plan also required joint decision-making for decisions on religious upbringing and 48-hour notice for church activities where parental participation would be appropriate. Nevertheless, Mother informed Father on a Saturday afternoon that one of the children was going to be baptized at her church the next day. Father informed Mother via text message and email that he could not attend, and he contacted the church to confirm that the baptism could be scheduled for another time. Mother proceeded with the baptism anyway, in Father's absence. Mother had referred to Father as "the birth father" when communicating with teachers and coaches and signed the children up for activities without listing Father as a contact person on the enrollment form, listing herself and Stepfather as "parents" instead.

Mother, on the other hand, claimed that Father had sent her countless harassing and condescending emails in the past three years, which, when printed, were enough to fill four large binders. She testified that Father would show up at routine dental appointments for the children just to vent his anger toward her. She also said the children would often return from Father's house knowing details about the court case or mediation, and they would be angry and asking questions that she did not find it appropriate to answer.

Father testified at trial that he "absolutely" wanted to change his behavior and that he intended to seek counseling to help him improve his parenting abilities and communication skills. He testified that he believed that he and Mother can effectively co-parent the children and make joint decisions when necessary. Mother, on the other hand, testified that she had

no hope of Father changing his ways, even with counseling. She conceded "it's possible" that her anxiety about dealing with Father can cause her to misinterpret things Father says. She stated emphatically that she simply cannot co-parent with Father. Mother testified that there should be one decision-maker so that the children would have peace and not experience further conflict.

Notwithstanding the trial judge's findings regarding Father's negative behavior, the court found that it was in the best interest of the oldest son to live primarily with Father, and it was in the best interest of the younger sons to continue with equal parenting time. The middle son, age twelve, stated in court that he wanted the equal parenting arrangement to continue. He said this allowed him to see each parent equally and "I don't feel like I miss the other parent too much because I know I'm going to go back, instead of staying with one of my parents for longer than the other." He also added, "I don't really think it's about what they want. It's what we want because it's how we're going to live." The middle son said he had discussed the residential schedule with his brothers, and that he and the youngest son wanted to continue with equal time, but the oldest son wanted to live with Father "more."

The trial judge acknowledged that joint parenting arrangements can be difficult "when the parties have the relationship that these two parties have." Nevertheless, the judge pointed out, "the parties agreed to this joint parenting arrangement, the children have become used to this joint parenting arrangement, and I believe ultimately that the children will be harmed by the fact that the joint parenting is not in place." The judge explained,

> The kids love their dad. To cause them to spend less time with their dad would be emotionally traumatic. Spending time in the drama of this lifestyle is traumatic. So which is less traumatic? You know, which is – which is worse? Allowing them to live in this drama? Or taking time away from their dad? And I'm going with taking time away from their dad. I think that would be more traumatic to the kids.

After the trial judge announced his oral ruling, counsel for Mother asked the trial judge if he had considered that Father was getting "what he wanted" despite his "bad behavior." The trial judge responded that to the extent Father was being "rewarded," to use counsel's words, it was "because ultimately I think it's in the best interest of – of the child." The trial judge said that, "ultimately," Father had "done a good job as a parent."

We, again, find that the trial judge provided a clear and cogent explanation for its decision to fashion the parenting plan in the manner that it did, and we cannot say that the judge applied an incorrect legal standard, reached an illogical result, resolved the case on a clearly erroneous assessment of the evidence, or relied on reasoning that caused an injustice.

"Custody should never be used to punish or reward the parents, but rather should promote children's best interests by placing them in an environment that will best serve their physical and emotional needs." *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996) (internal citations omitted). "Parenting decisions should not be intended or designed to reward parents for prior virtuous conduct, nor to punish them for their human frailties or past missteps." *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006). Parenting time "should not be granted or withheld for punitive purposes." *Slagle v. Slagle*, No. E2011-00785-COA-R3-CV, 2012 WL 1525013, at *11 (Tenn. Ct. App. Apr. 30, 2012) (citing *In re A.N.F.*, No. W2007-02122-COA-R3-PT, 2008 WL 4334712 at *18 (Tenn. Ct. App. Sept. 24, 2008)). The trial judge in this case appropriately focused on the best interest of the children in making its decision, not a desire to reward or punish one of the parents.

The trial court included specific provisions in the parenting plan to limit the parties' contact with each other, such as eliminating many holiday exchanges, eliminating joint decision-making on several issues, and limiting the parties to one weekly email to address parenting issues, with no disparaging or derogatory remarks. The parenting plan provided that neither parent can speak badly of each other or the members of the family of the other parent, and the parents must encourage each child to continue to love the other parent and be comfortable in both families. It also required the children to continue with counseling. We do acknowledge that, despite the trial court's best efforts, the joint parenting arrangement may prove troublesome for these two parents, just as it has in the past. However, we share the trial judge's sentiment that these two parents will likely have difficulty with *any* type of parenting arrangement. Indeed, the trial judge responded to Mother's criticism of the newly-fashioned parenting plan, in her motion to alter or amend, with the following statement:

> I certainly do not mind an attorney asking this Court to reconsider, but the Court does have great concerns by the further implication that it is this Court that has caused these parties to have a chaotic "and constant litigation mentality." This mentality existed well before this Court ever had the opportunity to weigh in on the Rousos children. This Court has been critical of both the Father and the Mother in their interactions one with the other as well as with their children.
>
> It is unfortunate that the parties were able to communicate well enough in their ability to make these three children, but now apparently are unable to confer with each other even on the most fundamental basics of co-parenting. It is further unfortunate that, in this Court's humble opinion, there is no court order crafted by man or God that will have any effect in providing a peaceful existence for these children if these parents continue to behave as immaturely and irrationally as they have over the past several years. This Court stands by its findings that [Father] and [Mother] love their children. The Court will

further find that both parties appear to be intelligent and reasonable people. However, in their effort to parent, they are failing. And for that failing they can blame the Courts and each other, but perhaps some introspection is what is truly needed.

After listening to numerous witnesses over the course of the five-day trial, the judge carefully fashioned a parenting plan that it deemed to be in the children's best interest, specifically taking into account the parties' communication problems. We will not substitute our judgment for that of the trial court in an attempt to reach a better result.

Finally, Mother argues that the trial court erred in giving Father sole decision-making authority on major educational decisions and non-emergency healthcare decisions. During closing arguments, Mother's counsel argued,

Decision-making has to be straightened out, Your Honor. These parties could not make a joint decision. If you look at Father's parenting plan, he still has joint decision-making on two of the subjects, religion and medical I think it was. There is no way – if we haven't convinced you of anything else, I'm sure we've convinced you of that. And so you've got to [] pick someone to make the decisions.

The trial judge did just that, designating Father as the one with decision-making authority over these issues. We cannot say that this decision was an abuse of discretion. A court fashioning a permanent parenting plan must ensure that the plan will "[m]inimize the child's exposure to harmful parental conflict." Tenn. Code Ann. § 36-6-404(a)(3). The plan must also "[a]llocate decision-making authority to one (1) or both parties regarding the child's education [and] health care[.]" Tenn. Code Ann. § 36-6-404(a)(5).

First, with regard to education, we note that the parties had already stipulated as to where the children would attend school in the future. Mother's counsel stated during closing argument, regarding educational decisions, "There's really no decision to make. We've agreed to put them in his school zone. That's over with[.]" Mother does not present any convincing argument on appeal as to why she should be given the decision-making authority for major educational matters.

Next, there is the issue of non-emergency healthcare decisions. The parenting plan stated that each parent will make decisions regarding the day-to-day care of a child while the child is residing with that parent, "including any emergency decisions affecting the health or safety of a child." However, Father would be responsible for scheduling all non-emergency medical appointments for the children. The order provided that the parties

may email one another to notify the other parent of medical appointment schedules and outcomes of appointments. The court required Father to notify Mother of all non-urgent medical care appointments scheduled at least 72 hours in advance of the appointment, and provided that Mother may choose to attend the appointment if she desires. The order provided that all non-urgent medical and dental appointments should be scheduled during Father's parenting time, unless there is no way to get the children seen in a reasonable timeframe, and then Father is allowed to schedule appointments during Mother's parenting time, but Mother will then have the right to take the children to the appointments Father schedules during her parenting time. The parenting plan provided that if Mother determines that one of the children needs urgent care that cannot wait until Father's parenting time, she is responsible for notifying Father so that Father can make a decision about the child and schedule the appointment if necessary. The court clarified in a later order that Mother or Father may email or text each other with regard to non-emergency medical care and those texts or e-mails are required to be answered by the receiving parent. Therefore, the order provided, "given that Father has medical decision making authority, if a child becomes ill while in Mother's care, Mother may advise Father by text or email that a child is ill. Father shall respond by text or email as to whether he will pick the child up and take him to the physician or that he does not believe the child needs medical treatment at that time. If Father declines to take the child to the doctor, Mother may take the child to the doctor because she thinks it is an emergency or she may seek assistance from the Court if she feels the medical needs were severe enough to warrant same."

The parties' previous parenting plan provided that non-emergency healthcare decisions would be made jointly. It was clear from the testimony at trial that this arrangement did not work. Father was responsible for paying 100% of uncovered medical expenses. However, he testified that he and Mother had little to no communication about the children's healthcare. He said he sometimes would not know that a child had been injured or on medication until months later when he received an explanation of benefits from his insurer. Or, he would discover that one of the children was prescribed an antibiotic when he would arrive at his house with the medication. Father said he learned through an EOB that the middle child had been prescribed an EpiPen in case of a severe allergic reaction, and two prescriptions for EpiPens had been picked up at the pharmacy. Father later learned that Mother had sent one EpiPen to the child's school, yet Father was never informed of it being prescribed, nor was he provided with one, even though the children were residing with him fifty percent of the time. Father also testified that although the boys are very healthy, Mother would take them to doctor appointments sometimes two to three times a week, often during school hours. He also said that Mother would take the children to see specialists rather than their regular pediatrician, which caused him to owe a co-pay that was three to five times greater than the normal charge. Considering the statement of Mother's attorney that the parties would be incapable of making decisions jointly, and given the testimony regarding

-25-

Mother's failure to collaborate with Father on healthcare decisions in the past, we cannot say that the trial judge abused its discretion in designating Father as the one with decision-making authority for non-emergency healthcare decisions.

After reviewing the voluminous record in this case, including all of the testimony from the five-day trial, it is our opinion that the trial court engaged in a thorough and careful review of the evidence, applied the appropriate legal standards, and deliberately fashioned a particularized parenting plan that the trial court concluded was in the best interest of the parties' three sons. We are not inclined to second-guess the trial judge's decision when it was so heavily based upon the trial court's assessment of the witnesses' credibility. As the Supreme Court said in *Armbrister*, 414 S.W.3d at 693, "determining the details of parenting plans is peculiarly within the broad discretion of the trial judge," and it is not our role on appeal to tweak the parenting plan in the hopes of achieving a more reasonable result. *See also* *Gonsewski*, 350 S.W.3d at 105 (explaining that the abuse of discretion standard "does not permit an appellate court to substitute its judgment for that of the trial court, but reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives, and thus envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.") We therefore affirm the trial court's orders modifying the residential parenting schedule.

### C.    Attorney's Fees

The next three issues relate to attorney's fees. Mother submitted a fee affidavit and requested an award of attorney's fees and costs in the amount of $178,520.49. The fee affidavit indicated that the attorney's fees attributable to prosecuting and defending criminal contempt charges totaled $13,700. Father submitted a fee affidavit in support of his request for an award of attorney's fees and costs indicating that the total bill he incurred for "the civil case" was $57,145, and the amount he incurred for "the criminal case" was $5,880.

The procedural history of the case, as it pertains to the issue of attorney's fees, is somewhat confusing. The trial judge announced at the end of the trial that he would not make any award of attorney's fees until after the hearing on Father's petition for contempt against Mother, which was postponed indefinitely. Later, in response to a motion filed by Mother, the trial court decided to go ahead and rule on the issue of attorney's fees due to the expected delay in hearing the postponed matters. However, no orders were entered contemporaneous with these decisions. Following a hearing on April 30, 2013, of which we have no transcript, the court entered several orders on June 14, 2013. One order addressed matters that were decided at trial and recited the trial court's original ruling to reserve the issue of attorney's fees, stating, "the issue of attorney fees shall not be considered until the Petitions for Criminal Contempt against Mother are resolved." Another order, addressing

Mother's motion to alter or amend, stated, "The Court will, thus, render its opinion on attorney's fees in the competing petitions for modification of the parenting schedule which have been tried," but the court permitted counsel for Father to file an amended fee affidavit within seven days, prior to its ruling. The order stated that when the court ruled on the attorney's fee issue, "that ruling will be a final and appealable order on the modification of the parenting schedule." The order also stated that there would be no argument on the attorney's fee issue prior to the ruling. Father's counsel had submitted her fee affidavit on May 7, 2013, within days of the April 30 hearing.

Also on June 14, 2013, the trial court entered an "Order of Attorneys' Fees." This order provided:

> This cause came before this Honorable Court on the 30th day of April, 2013, wherein the Mother/Defendant requested the Court to alter its original Orders with regard to awarding attorneys' fees upon a finding of contempt against the Father/Plaintiff. The Court had originally stated that the issue of attorneys' fees would be reserved until the Father/Plaintiff's Petition against the Mother/Defendant could be finally heard. Counsel for the Mother/Defendant correctly pointed out to the Court that such a decision by the Court left the Order open and therefore may cause problems with an appeal since the Order may not be considered final. The Court accepted that argument and agreed that attorneys' fees should be assessed with regard to the findings of contempt which were found against the Father/Plaintiff upon a hearing on the 15th and 16th days of April, 2013. The Court instructed the parties to submit some further affidavits with regard to fees and took the ultimate issue of fees under advisement.

> The Court now having reviewed the Affidavits that have been filed, the final Orders of the Court with regard to the contempt, and the file as a whole, is prepared to find as follows:

> While the fees generated by Mother/Defendant's counsel, Ms. Helen Rogers and her office, are significant in the final amount, the Court acknowledges the parties were particularly contentious, unable to communicate effectively, one with the other without intervention of legal counsel, and the issues presented were complex. The Court has never had cause to doubt the reasonableness of the fees charged by Ms. Rogers previously and is willing to accept the reasonableness of the fees assessed herein.

-27-

With regard to the contempt petitions, the Court ultimately found the Father/Plaintiff guilty of two of the nine counts originally alleged. While only two counts were ultimately sustained by the Court, the accusations made were of a relatively egregious nature. Those accusations included harassing behavior by the Father/Plaintiff towards the Mother/Defendant as well as involving the children in legal issues beyond their need. The Court made specific findings with regard to the Father/Plaintiffs lack of judgment in the matter and disregard for previous Orders  rendered by the Court.

Considering all of the appropriate factors with regard to the assessing of fees, including the reasonableness of said fees as well as the ultimate outcome and findings by the Court, the Court orders that the Father/Plaintiff pay $25,000 to the Mother/Defendant to reimburse her necessary expenses in prosecuting the contempt Petitions referred to above. Said $25,000 amount will be made a judgment by this Court and may be executed upon by the Mother/Defendant as she deems necessary and appropriate.

Thus, the trial court's "Order of Attorneys' Fees" specifically stated that it was awarding Mother $25,000 "to reimburse her necessary expenses in prosecuting the contempt Petitions," but it did not expressly reference attorney's fees in connection with the modification proceedings, nor did it state whether its award was intended to compensate Mother for filing the petition for *civil* contempt.  Both parties, in their briefs on appeal, argue that the trial court erred in failing to award them their attorney's fees incurred in connection with the modification proceedings.  In other words, they appear to interpret the trial court's order, granting only $25,000 to Mother for prosecuting the contempt petitions, as denying their requests for any additional attorney's fees related to the modification proceedings.  Mother also argues that the trial court should have awarded her "all" of her attorney's fees for prosecuting the petitions for civil contempt.

Again, we do not have a transcript of the hearing that led to the entry of these orders. Neither party contends that the trial court failed to consider their requests for attorney's fees in connection with the modification proceedings.  It is clear from a review of the previous orders, above, that the trial court intended to "render its opinion on attorney's fees in the competing petitions for modification of the parenting schedule" after Father's counsel submitted her amended fee affidavit, and that there would be no further argument related to that issue prior to the court's ruling.  Father's counsel did, in fact, submit her amended fee affidavit shortly after the hearing.  Nevertheless, due to the lack of specificity in the "Order of Attorney's Fees," we are unable to adequately review the trial court's award, because we cannot discern which portion of the attorney's fee award was attributable to which proceeding.  Therefore, we find it appropriate to vacate the trial court's "Order of Attorney's

Fees" and remand to the trial court for specific findings pertaining to this issue, adequately differentiating between any award of attorney's fees for the criminal contempt proceeding, the civil contempt proceeding, and/or the custody modification proceeding.

Finally, both parties seek an award of attorney's fees on appeal. "An award of appellate attorney's fees is a matter within this Court's sound discretion." *In re C.W.*, 420 S.W.3d 13, 22 (Tenn. Ct. App. 2013) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). "In considering a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case." *Id.* (citing *Darvarmanesh v. Gharacholou*, No. M2004–00262–COA–R3–CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005)).

In the present case, exercising our discretion, we respectfully decline to make an award of appellate attorney's fees.

### IV.   CONCLUSION

For the aforementioned reasons, the trial court's orders on the parenting issues are affirmed and the matter is remanded for further proceedings as may be necessary. The order on attorney's fees is vacated and remanded for further proceedings. The trial court's order on the issue of criminal contempt is not a final, appealable order subject to review at this time, and the appeal of that order is dismissed. Costs of this appeal are taxed equally to the appellant, Kristi L. (Rousos) Boren, and her surety, and to the appellee, Daniel P. Rousos, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.